**UNITED STATES of America**

v.

**William Johnny MASON, Ricky Lynn Creekmore, David Lee Kelso, Ray Winford Steele, Roger David Handley.**

**No. CR 84–AR–104–NE.**

United States District Court, N.D. Alabama.

Oct. 17, 1986.

Frank W. Donaldson, U.S. Atty., Bill Barnett, Asst. U.S. Atty., Craig Shaffer, Barbara Kammerman, Albert Moskowitz, U.S. Dept. of Justice, Washington, D.C., Wm. Bradford Reynolds, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Ann Robertson, Sp. Asst. U.S. Atty., Birmingham, Ala., for U.S.

Bryce Graham, Tuscumbia, Ala., for Mason.

Donald L. Colee, Jr., Birmingham, Ala., for Creekmore.

George C. Lucas, Birmingham, Ala., for Kelso.

Mark Ellis Martin, Birmingham, Ala., for Steele.

John Sudderth, Birmingham, Ala., for Handley.

## MEMORANDUM OPINION

ACKER, District Judge.

On October 3, 1986, the court conducted an evidentiary hearing in which evidence was received in support of and in opposition to the separate motions of defendants Mason, Kelso, Steele and Handley to suppress certain self-incriminating testimony formerly given by them either by deposition in a civil case or by trial testimony in another criminal case. It was made known to the court that defendant Creekmore gave no deposition or trial testimony in another case, thus rendering moot his motion to suppress his own prior statements. The motion to suppress filed by defendant Riccio was not heard on October 3, 1986, because Riccio is in federal custody, and his case is the last set for trial.

The court will address the motions of Mason, Kelso, Steele and Handley in the order in which they were heard. Each of the said four defendants has invoked and relies upon all evidence received at all former suppression hearings.

## ADDITIONAL FINDINGS OF FACT PERTINENT TO ALL FOUR DEFENDANTS

Insofar as the findings of fact contained in the Memorandum Opinions of July 27, 1984, July 14, 1986, September 8, 1986, and September 18, 1986, may apply to the suppression motions of Mason, Kelso, Steele and Handley, or any of them, those findings are reaffirmed and incorporated in this opinion. The said three opinions, and this one, represent an evolutionary process in the court's thinking, with some changes of mind based on new evidentiary material.

On October 3, 1986, additional evidence was offered and received on the issue of the "sole purpose" for the filing of CV 80–HM–1449–S, and on the question of the relationship between Southern Poverty Law Center and the Department of Justice at the time of the taking of the civil depositions sought to be suppressed. Mr. Dees not unexpectedly testified that he agrees with the finding contained in the opinion of the Eleventh Circuit of June 25, 1985, in *United States v. Handley,* 763 F.2d 1401 (11th Cir.1983), that his sole purpose was not to obtain evidence for a criminal prosecution. Also, he again disclaimed any two-way relationship with the Department of Justice. In fact, he even disclaimed *any intent whatsoever* in his CV 80–HM–1449–S to obtain information by discovery upon which to base a criminal indictment. In this disclaimer he was in disagreement with the Eleventh Circuit. He admitted that one of his purposes was to ask, by way of *ultimate relief,* that *Judge Haltom turn over to the Government any evidence of criminal conduct which might be discovered.* In other words, if Mr. Dees has not gotten ahead of Judge Haltom by several years, the federal criminal statute of limitations would have run long before Judge Haltom could have ordered the relief requested by Mr. Dees. This court believes that the Eleventh Circuit's finding on this narrow question was not only supported by what it had before it but by what this court now has before it.

It was both on the basis that there was no proof of an agency relationship between Mr. Dees and the United States *and* on the *entirely separate* basis that there was no proof of an absence of other legitimate reasons for CV 80–HM–1449–S that the Eleventh Circuit refused to impute to the Government, "[a]ny compulsion exerted by Mr. Dees and the Center against the civil defendants". 763 F.2d 1406.

First, the court doubts the credibility of Mr. Dees in several material respects. Mr. Dees obviously and admittedly has very strong feelings about this case. He makes no bones about it. He is far from being a disinterested bystander. He is dedicated to seeing that justice, as he sees it, is

done. In this dedication he may share some of the attributes of the defendants. After testifying about his allegedly legitimate strategy reasons for recently resisting a motion to set CV 80–HM–1449–S for trial, he made an effort, on cross-examination, to explain why on February 1, 1985, he wrote to quite a number of his civil defendants a letter, which, *inter alia,* said:

No date for trial has been set, but the plaintiffs [Peoples Association of Decatur, et al.] are ready to try this case and *plan to ask the judge to set a trial date as soon as possible.*

(emphasis supplied).

As between Mr. Dees' two conflicting positions respecting his desire for a trial in CV 80–HM–1449–S, the court prefers to believe that Mr. Dees' formal request to Judge Haltom that CV 80–HM–1449–S *not* be set for trial until after this criminal case is tried is his honest position. Mr. Dees' letters to his *pro se* civil defendants, who are easily subject to intimidation, does not subject him to possible Rule 11, F.R.Civ.P. sanctions, whereas his pleading filed in CV 80–HM–1449–S would subject him to sanctions. In fact, this court remains convinced that Mr. Dees will be just as happy if CV 80–HM–1449–S is *never* set for trial, that is, if criminal convictions are obtained in this case.

One of Mr. Dees' arguments, made under oath on October 3, 1986, on behalf of the Government, for some vitality in his civil case apart from the obtaining of information for an indictment (which as previously noted, was denied by Mr. Dees as even *one* of his purposes, though recognized by the Eleventh Circuit as at least *one* of his purposes), is that the issues in CV 80–HM–1449–S expanded *after* the depositions of Handley, Steele, Riccio, Tucker, Godfrey, Mason and White, to embrace a continuing conspiracy, including the burning of the Center's offices in Montgomery in the Middle District of Alabama. The problem with this argument is that this expansion of Mr. Dees' law suit occurred *after* the depositions made the subject of the suppression motions and cannot be considered as any

proof of Mr. Dees' purpose and intent *at the time he took these depositions.* If Mr. Dees changed his mind after 1983 and decided to use CV 80–HM–1449–S for a new and expanded purpose, his "sole purpose" in early 1983 nevertheless was to feed information to the Government.

Mr. Dees' explanation, now offered for the first time, for never having served his civil defendant, Creekmore (a matter mentioned in previous Memorandum Opinions and which Mr. Dees obviously desired on October 3, 1986, to refute), is that Mr. Dees has abandoned his civil pursuit of Creekmore only because the depositions of Handley, Steele, Riccio, Tucker, Godfrey, Mason and White were taken before Creekmore could be served, and inasmuch as Creekmore had no notice of them, they would not be available for use against Creekmore in CV 80–HM–1449–S. There are at least two obvious flaws in this argument. The first is that if years ago Creekmore was no longer a civil target it would have been a simple matter to dismiss CV 80–HM–1449–S as against him. This has not been done. The second is that a large number of civil defendants were added after Creekmore had been named a defendant and after many civil depositions had been taken. In fact, on this theory the depositions of Handley, Steele, Riccio, Tucker and Godfrey could not be used against White or Mason. The court file in CV 80–HM–1449–S indicates that many depositions were taken by Mr. Dees without proper prior notice to each and every *pro se* defendant and to each and every lawyer appearing for a civil defendant. The task of sorting out which civil depositions can be offered against which defendants in the civil case will be monumental, *if and when* the case is ever tried. This sloppiness in noticing depositions is another fact which tends to prove that the depositions were taken without expecting ever to use them in a civil context. If not in the civil case in which taken, then in what case?

Another serious credibility doubt arises from Mr. Dees' quite positive testimony that he and the Center never deposed

James Smith in CV 80–HM–1449–S. Mr. Dees did not say that his memory could be faulty on this subject. Instead he quarrels with the court record in CV 80–HM–1449–S, of which this court takes judicial notice and which reflects not only that Mr. Dees *did* depose James Smith but checked out the James Smith deposition "under seal" and has not returned it. The docket sheet in CV 80–HM–1449–S shows on March 19, 1984:

"Deposition of James A. Smith taken on behalf of plff, filed—slm."

The docket sheet shows on May 2, 1985:

"ORDER that the depositions of Donnie Spradlin; George Spradlin; James Blair; Wendell Dean Van Meter; *James Smith* and William Hendrix are checked out, under SEAL, to plff's attorney, filed, cs, bth."

(emphasis supplied).

Who is this court to believe, Mr. Dees or the court's own records? A separate, but interesting unanswered question is: "Why is a civil deposition 'under seal'?" Another interesting unanswered question is: "How does a party check out a deposition and keep it over a year?"

It is an easy matter for Mr. Dees simply to assert that he had more than one purpose for filing CV 80–HM–1449–S. This assertion is analogous to the "articulated, legitimate, non-discriminatory reason" for an employment decision adverse to an employee in Title VII cases under the *McDonnell-Douglas* analysis. The tryer of fact in a Title VII case, using his common sense and based on the totality of the evidence, including circumstantial evidence, may find that such an articulated, legitimate non-discriminatory reason, is pretextual. Based on the additional substantial direct and circumstantial evidence offered and received by this court subsequent to the opinion of the Eleventh Circuit rendered on June 25, 1985, this court cannot avoid finding that at the time Mr. Dees deposed Handley, Steele, Kelso, Tucker, Riccio, Mason and White his "sole purpose" was to obtain evidence against them for a possible federal indictment. In evaluating the testimony of Mr.

Dees, the court cannot avoid recalling the hackneyed but helpful admonition, "Actions speak louder than words."

The other, separated, but connected issue raised by all defendants is whether or not there was, in fact, some sort of working relationship between Mr. Dees and the United States at the time these civil depositions, or any of them, were taken. If, based on substantial evidence presented after June 25, 1985, the court finds that Mr. Dees was, in truth, an informal arm of the Government for taking a civil deposition, it matters not whether Mr. Dees had some legitimate purpose for taking the deposition other than as part of the criminal investigation. The new evidence on this question requires analysis.

During his testimony on October 3, 1986, Mr. Dees may have committed a Freudian slip. He was questioned and answered as follows:

THE COURT: My point, though, and getting back to the discussion of the *res judicata;* if, for instance, Mr. Handley were convicted in this court of the charges made against him in this court and in the criminal indictment, that would not be *res judiciata* on any of the continuing conspiracy items that were added after the burning in Montgomery, would it, in your view?

MR. DEES: Your Honor, I think the only thing, and I am assuming the facts would all be the same, from what he was convicted of, because he may have been convicted of *concealment;* may have been convicted of *intimidating the witness.* I don't know. *We charged that* —I don't know which one he is convicted of. But assuming he was convicted of exactly that same civil allegation that he conspired to beat up the blacks on the street of Decatur to deprive them of their right—

THE COURT: When you say *"We* charged him", did *you* charge him of any of those things?

(emphasis supplied).

Mr. Dees was in effect, saying that *"We* charged Handley with concealment and in-

timidating witnesses". The Peoples Association of Decatur did not make any such charges. The criminal indictment by the United States *does* make these charges. Who, then, constitutes "WE"? Mr. Dees was inadvertently identifying himself with the Department of Justice and was including himself as one of the designers of the indictment.

Another new piece of evidence came from Mr. Dees on October 3, 1986. It now appears for the first time that Mr. Frohsin's attendance during the testimony of Letson on October 20, 1982, before Judge Haltom was *at the express invitation of Mr. Dees.* Mr. Dees testified as follows on October 3:

> MR. DEES: ... at that time I asked Mr. Frohsin, at the time I told him we were going to put on Lloyd Letson, *asked him to sit in there and listen to the testimony.*

(emphasis supplied).

In other words, Mr. Frohsin's presence during Mr. Letson's testimony was unnecessary to Mr. Frohsin's mission simply to accompany a subpoenaed FBI agent to the hearing. This gives new meaning to the letter of June 7, 1983, from Mr. Dees to Mr. Frohsin, with a copy to Mr. Rinzel. When on June 7, 1983, Mr. Dees addressed Mr. Frohsin, "Dear Henry", and said, "You *mentioned*" (*past tense*), it becomes obvious that Mr. Frohsin, a then assistant United States attorney, and Mr. Dees had communicated about the significance of the civil case *well prior to the meeting of July 23, 1983.*

On October 3, 1986, Mr. Dees denied ever having told Tucker that if Tucker would cooperate Mr. Dees would try to keep Tucker from being indicted. In its brief in opposition to Mason's motion, the United States argues:

> During his testimony on October 3, Mr. Dees emphatically denied that any such overture was made to defendant Tucker.

In 1984 this court and in 1985 the Eleventh Circuit considered only a cold, written, undisputed deposition of Mr. Dees. Today this court considers conflicting live testimony from Tucker and Mr. Dees and, with some reluctance, the court believes that Tucker's recollection is correct. While both Tucker and Mr. Dees have an interest in the outcome, Tucker is more likely to recall a one-time conversation with Mr. Dees that Mr. Dees is to recall a one-time conversation with Tucker. Furthermore, when he testified on October 3, Mr. Dees must not have remembered the following statement contained in his letter of June 7, 1983, to Mr. Frohsin:

> You mentioned that one of the problems *you* might have with *our witnesses who we have agreed not to pursue as plaintiffs in exchange for their testimony* is the bias a jury might attribute to their statement.

(emphasis supplied).

Mr. Dees wrote down and signed his name to the fact that he was using his civil case to bargain for testimony in the criminal case, and Mr. Frohsin knew it.

The totality of the evidence, considering credibility factors and applying common sense, leads this court to two factual conclusions: (1) That Mr. Dees' sole purpose in CV 80–HM–1449–S was to conduct a criminal investigation; and (2) that Mr. Dees had a working relationship with the United States as early as his taking of the depositions of the civil defendants in CV 80–HM–1449–S.

## WILLIAM JOHNNY MASON

■ Mason's deposition was taken by Mr. Dees in CV 80–HM–1449–S on August 15, 1983. Mason seeks the suppression of his said deposition on the following separate and several grounds:

(1) That Mr. Dees' "sole-purpose" was to obtain information for a criminal proceeding. As to this ground Mason not only points out that he was not an appellee in *United States v. Handley,* but that there is substantial new evidence after *United States v. Handley* which would make the "law of the case" inapplicable.

(2) That, based on new evidence since *United States v. Handley,* Mr. Dees was,

in fact, the alter ego of the Government at the time Mason's deposition was taken so that his acts are to be attributed to the Government.

(3) That Mason's deposition contained a stipulation preserving his right to object at trial.

(4) That Mason's deposition was compelled.

Everything which the court said in its Memorandum Opinion and Order of September 18, 1986, upon the granting of White's motion, an Order from which the United States has taken an appeal to the Eleventh Circuit, is applicable to Mason's motion. However, Mason has an argument which White did not have, and which no defendant deposed by Mr. Dees prior to July 23, 1983, has. It may better illustrate the conflict-of-interest which counsel who represents both White and Mason has than the court was able to explain it to White and Mason. Mason's deposition was taken on August 15, 1983, *after* the letter of June 7, 1983, from Mr. Dees to Mr. Frohsin, and *after* the meeting between Mr. Dees and Mr. Rinzel on July 23, 1983, at which Mr. Dees admittedly passed on to the Government the civil depositions which Mr. Dees had already taken. On this factual point, the opinion of the Eleventh Circuit of June 25, 1985, says:

> If no Government official had any connection with the depositions or any knowledge of misconduct in their taking *until after the fact,* then they are admissible. [citation omitted].
>
> \* \* \* \* \* \*
>
> The government first received deposition excerpts at the Birmingham meeting on July 23, 1983.
>
> \* \* \* \* \* \*
>
> This evidence is insufficient to show *governmental knowledge at the time of the alleged misconduct.*

763 F.2d at 1405 (emphasis in original and supplied).

It is obvious that *before* August 15, 1983, the Government had examined the following depositions:

Riccio's deposition of February 17, 1983
Tucker's deposition of February 17, 1983
Steele's deposition of March 14, 1983
Godfrey's deposition of March 14, 1983
Riccio's deposition of March 15, 1983
Handley's deposition of March 15, 1983
White's deposition of July 19, 1983 (possible).

After July 23, 1983, the United States could not, and cannot now, successfully disassociate itself from Mr. Dees' obvious pattern of compulsion, a pattern which the Eleventh Circuit, by no stretch of the imagination, condoned, but to the contrary, impliedly criticized when, based upon the evidence it then had, it disassociated the Government from any "impropriety" or any "compulsion" by Mr. Dees prior to July 23, 1983.

For the foregoing reasons any "impropriety" or any "compulsion" by Mr. Dees in the taking of Mason's deposition after July 23, 1983, is properly attributable to the Government. Not only would a reading of the depositions taken earlier than August 15, 1983, have revealed Mr. Dees' *modus operandi,* but Mr. Dees' letter of June 7, 1983, to Mr. Frohsin refers to *"one* of the problems you might have with our witnesses" (emphasis supplied). What were the *other* problems with which Mr. Frohsin was familiar at that time? The court won't venture to guess.

On August 15, 1983, Mason's attorney, Mr. Hovater, informed Mason that he had to answer Mr. Dees' questions, and Mason did answer numerous self-incriminating questions. This took place after it had been well publicized in the media, and was known to Mason, that the federal criminal investigation of the Decatur incident as to possible Klan criminality had been concluded. The legal advice which Mason received from Mr. Hovater on August 15, 1983, may be explained by Mr. Hovater's erroneous belief that the federal criminal statute of limitations had run, or Mr. Hovater may have simply believed what he had read in the newspaper, namely, that the case was closed. On the other hand, his advice may

be explained by his knowledge of the February 8, 1983, order, even though that order did not apply directly to then non-party Mason. Or, the advice may be explained by the formal stipulation which Mr. Hovater entered into with Mr. Dees before the deposition began, the stipulation which reserved Mason's right to interpose any and all objections when and if the deposition were ever offered into evidence.

The United States not unexpectedly repeats its off-repeated argument that Mr. Dees was not its agent when Mason's deposition was taken, and that Mr. Dees on behalf of the United States could not enter into a contract with a criminal confessor binding on the United States to preserve a Fifth Amendment privilege while at the same time the criminal confesses. This argument of the United States in its most recent brief appears as follows:

> The United States was not present at those depositions and did not enter into that stipulation. Consequently, the Government is not bound by such an agreement and can use said testimony in this criminal proceeding. Mr. Mason had not only the right, but the duty, under the Constitution to assert his privilege against self-incrimination if he wished to protect himself from the possibility that a state or federal agency would use the information in his answers in a subsequent criminal prosecution.

This court not only has found that Mr. Dees is, under the overall circumstances, to be deemed an investigative representative of the United States on August 15, 1983, when Mason's deposition was taken, but, in the alternative, this court finds that when Mr. Dees handed over Mason's deposition to the United States, that delivery is not analogous to the transfer of a promissory note where the assignee is a "holder-in-due-course" or a "bona fide purchaser-for-value-without-notice", but rather is analogous to an assignment which carries with it all of the limitations contractually negotiated by the assignor and attached to the item assigned. If the limitation was binding on Mr. Dees, the assignor, it was binding on the United States, the assignee. If Mr. Dees was not the agent of the United States when he entered into the written stipulation, he nevertheless overtly agreed with his deponent that by his answering the questions the deponent was not thereby waiving his Fifth Amendment privilege and instead could raise the objection later. If a person does not *voluntarily* waive his Fifth Amendment privilege, but rather *expressly preserves it,* he can hardly be argued to have "voluntarily waived his Fifth Amendment privilege". A more appropriate analogy is to the doctrine of immunity. Where testimony is procured under a promise of immunity, it is not useable against the deponent. The United States, in effect, argues that it can renege on Mr. Dees' promise because it was not a party to that promise. The United States does not want to look its gift horse in the mouth, no matter how patently snaggled toothed the horse may be. If this horse was a pure gift, it was received with all of its snaggled teeth. If it was not a gift, and carried with it a consideration from the recipient, no matter how small, the conduct of Mr. Dees is, of course, attributable to the recipient.

Contrary to his own then undisclosed intent on August 15, 1983, (an intent certainly not shared with his deponent), Mr. Dees may have inadvertently granted his deponent use immunity as to those portions of his deposition in which self-incriminating testimony was elicited. If the Mason deposition were not already clearly tainted with the Government's prior knowledge of Mr. Dees' *modus operandi,* it nevertheless was and is subject to the express limitations and reservations upon which the deposition was taken.

## DAVID LEE KELSO

■ Kelso's situation is markedly different from the situations of all other defendants. He was never deposed in CV 80–HM–1449–S. In October, 1980, he testified against Curtis Robinson in *State v. Robinson.* He was the alleged "victim" of the criminal assault for which Robinson was tried and convicted in state court. Kelso

volunteered as a prosecution witness. His only claimed basis in this court for a suppression of his testimony in *State v. Robinson* is that he thought that the criminal investigation of the Klan as to the Decatur incident was over, and had he realized that there was still federal criminal exposure he would not have testified. As ironic as it may be, by voluntarily coming from Texas to testify successfully against his alleged attacker, Kelso may have inadvertently confessed to some of the factual elements of an involvement in a possible federally prohibited conspiracy. The court finds that Kelso's testimony in *State v. Robinson* was voluntarily, freely and knowingly given and is not due to be suppressed for being coerced. Kelso's testimony is totally different from Tucker's testimony in *State v. Robinson*. Tucker's testimony, as previously discussed, was in response to a subpoena from Robinson's defense counsel, who advised Tucker that he would not need a lawyer.

■ Kelso also testified by deposition in December 1979, in a civil case in the Circuit Court of Morgan County entitled *Kelso v. Robinson*, CV 79–429, wherein Kelso sought tort damages from Robinson for the gunshot wound which Kelso sustained in the Decatur incident. The wound itself, and the content of Kelso's civil complaint, establish Kelso's physical presence at the Decatur incident. Kelso's civil deposition, taken by Mr. Carroll of the Center, which represented Robinson both in *State v. Robinson* and in *Kelso v. Robinson*, was entirely different from the depositions taken by Mr. Dees of the civil defendants in CV 80–HM–1449–S. In the first place in CV 79–429 Kelso was the *plaintiff* rather than a *defendant*. A civil *plaintiff* forfeits his rights against relevant self-incriminatory questioning, that is, if he continues to prosecute his civil complaint. In the second place, Kelso was not under a formal court order requiring him to testify under penalty of contempt. He could have gracefully dismissed his civil suit against Robinson rather than to waive his Fifth Amendment privilege. He apparently testified in order to maintain the viability of his tort suit

against Robinson. His deposition in *Kelso v. Robinson* was entirely voluntary.

■ Still, Kelso's deposition in CV 79–429 is now subject to suppression because it was taken only after the stipulation had been reached to preserve Kelso's rights to object. Mr. Dees was not forced to enter into this stipulation. Such a stipulation, while not unusual, does not always appear. Mr. Dees could have required that all objections be stated at the deposition. Rule 30(c), Alabama Rules of Civil Procedure, makes no mention of such a stipulation. Instead, it simply says:

> Examination and cross-examination of witnesses may proceed as permitted at the trial under the provisions of Rule 43(b). The officer before whom the deposition is to be taken shall put the witness on oath and shall personally, or by someone acting under his direction and in his presence, record the testimony of the witness. The testimony shall be taken stenographically or recorded by any other means ordered in accordance with subdivision (b)(4) of this rule. If requested by one of the parties, the testimony shall be transcribed.

> *All objections made at the time of the examination* to the qualifications of the officer taking the deposition, or to the manner of taking it, or *to the evidence presented,* or to the conduct of any party, and *any other objection to the proceedings, shall be noted by the officer upon the deposition. Evidence objected to shall be taken subject to the objections.*

(emphasis supplied).

The fact that Mr. Dees did not insist on Rule 30(c) as written may well have induced Kelso into proceeding to answer questions instead of invoking his Fifth Amendment privilege at that time. The mere possibility of having employed such a devious method for obtaining a confession is so fundamentally unfair as to raise "due process" considerations as well as the constitutional problem of self-incrimination. In its brief the United States argues:

Such a rule would give private litigants the ability to grant themselves use immunity. Such a proposition is ludicrous and contrary to law and common sense.

This court regrets that the United States characterizes this court's reasoning as ludicrous and contrary to common sense. Whether or not the court's ideas are contrary to law may be legitimately debated.

An irrefutable basis for the suppression of Kelso's civil deposition in CV 79–429 is that the deposition was not furnished by the Government to Kelso's appointed counsel until October 2, 1986, one day before Kelso's suppression hearing, and long after Kelso's civil counsel in CV 79–429 had disappeared from Alabama and had become unavailable. Counsel for the Government first informed the court on October 3, 1986, that he "believed" that he had furnished this deposition to Kelso's counsel in 1984. Kelso's counsel has unequivocally denied this suggestion, and several other defense counsel have filed affidavits flatly stating that they never received from the Government such a civil deposition given by Kelso. Kelso's counsel is, thus, thoroughly corroborated on this crucial fact. Despite the magistrate's clear order entered pursuant to Rule 16, F.R.Cr.P., requiring the Government to deliver to defendants' counsel all statements made by defendants if in the Government's possession, the Government unexplainably failed to do so. The Government admittedly had Kelso's civil deposition on July 19, 1984, but did not produce it until October 2, 1986, over a month after this court had already severely criticized the Government for other Rule 16 violations.

The question, then, resolves itself into whether or not the Government's intransigent non-compliance with Rule 16 as to Kelso's civil deposition in CV 79–429 is egregious enough to warrant suppression. On August 23, 1986, counsel for the United States apologized for failing to produce an important discovery item, namely, Tucker's testimony in *State v. Robinson* acquired by the Government in the late summer or fall of 1985, but not produced until August 20, 1986. This court was and is amazed by the Government's attitude, as if it has the right to decide how and when to comply with Rule 16. Whether the Government's failure to produce Kelso's deposition, which it had in its possession from at least July 19, 1984, and wholly failed to produce, was inadvertent or was cavalierly deliberate, the Government on this occasion fails even to apologize. It must anticipate that apologies do not suffice. Instead, it asserts that it "believes" that it furnished this deposition. The court does not believe what the Government "believes", and finds, instead, that the Government has no valid excuse for this failure, which is as inexcusable as any discovery violation could possibly be.

As recently as September 5, 1986, the Eleventh Circuit dealt with a Government discovery violation in *United States v. Rodriguez*, 799 F.2d 649 (11th Cir.1986). The following enlightening comment there comes from the Eleventh Circuit:

> The district court properly held that the failure of the Government to disclose this material to the defendant, and to permit him to inspect and to copy it, violated Fed.R.Crim.P. 16(a)(1)(C) and the magistrate's standing order. Contrary to the Government's argument, the requirement that defendant be given things which "were obtained from or belong to" him does not turn on whether they are material intended for use by the Government as evidence in chief at the trial.

> \*     \*     \*     \*     \*     \*

> The argument of Government's counsel reflects a serious misunderstanding of the requirements of this discovery rule, confusing it with the discovery required of material the Government plans to use in the case. The district court's decision that there was a discovery violation is not clearly erroneous.

> \*     \*     \*     \*     \*     \*

> *Relief for violations of discovery rules lies within the discretion of the trial court.*

> \*     \*     \*     \*     \*     \*

In *United States v. Padrone,* 406 F.2d 560 (2d Cir.1969), the Government inadvertently did not inform the defense that it had a statement given by the defendant. Defense counsel allowed Padrone to take the stand without realizing the witness would be subject to effective cross-examination based on prior inconsistent statements. The court, in reversing and ordering a new trial, stated:

> We believe that *noncompliance with an order to furnish a copy of a statement made by the defendant is so serious a detriment to the preparation for trial and the defense of serious criminal charges* that where it is apparent, as here, that his defense strategy may have been determined by the failure to comply, there should be a new trial.

(emphasis supplied). Slip Op. pp. 590–93. If this court had not beaten the Government over the head and insisted on the revelation of discovery materials required by Rule 16, and if the Government had obtained a conviction in this case, the waste of judicial energy would have been much more than the energy here being expended by this court. There are several points of comparison between Kelso's situation and Rodriguez's situation. As did Rodriguez, Kelso depended not only upon Rule 16 itself but upon a magistrate's order pursuant to Rule 16. However, in *Rodriguez* the Government excused its failure by saying that it did not plan to use the withheld material. To the contrary, in Kelso's case, the Government says that it *does* plan to use the withheld material as an important part in its case-in-chief, and yet allowed years to pass before it revealed the material to Kelso one day before the suppression hearing, with the following lame note to Kelso's counsel:

> I am not certain you received this as part of the 136 depositions copied in 1984. Out of an abundance of caution, I wanted to drop it off.

This "abundance of caution" which overwhelmed the Government at the last bloody minute, is not sufficient to ward off the only appropriate sanction of suppression under Rule 16.

Kelso is set for trial on November 10, 1986. The Government last argues that Kelso cannot be prejudiced by the Government's inexcusable delay in not releasing his 1979 deposition to Kelso's counsel until October 2, 1986. In this court's opinion, there are, or may have been, many strategy decisions made by Kelso between the time Kelso was indicted and the present time, all without his counsel's even knowing about Kelso's civil deposition in CV 79–429, much less having read it, and without an opportunity ever to consult with Kelso's lawyer in CV 79–429. Kelso never informed his present counsel about this 1979 deposition, and Kelso himself had never read his deposition until October 3, 1986. Would, as perhaps suggested in *United States v. Sarcinelli,* 667 F.2d 5 (5th Cir. Unit B, 1982), and in *United States v. Euceda-Hernandez,* 768 F.2d 1307 (11th Cir.1985), a continuance be a solution to the problem in this case? It is obvious that the United States would not suffer from a continuance. A continuance would not constitute any sanction whatsoever against the United States for its unforgiveable refusal to honor a Rule 16 discovery order for over three years. However, if the Speedy Trial Act has any meaning, it would preclude another continuance of Kelso's case where the continuance would be the result of a serious default by the Government. The Government has no satisfactory explanation for its non-disclosure. Rule 16(d)(2) itself expressly provides as an option available for the Government's failure to comply with a discovery order that the trial judge may "prohibit the party from introducing evidence not disclosed". This court finds no case which denies this language its facial meaning. The authors of Rule 16 obviously contemplated that there is a set of circumstances which will make suppression the appropriate sanction. Under the particular circumstances of this case this court, in an exercise of its discretion, deems that the suppression of Kelso's 1979 civil deposition is the appropriate sanction. Using the factors outlined in *Sarcinelli:*

854

(1) there is no reasonable or satisfactory explanation why the disclosure was not made until one day before the suppression hearing; (2) Kelso will or may be substantially prejudiced by the use of the evidence; and (3) there is no real feasibility in attempting to rectify the prejudice by a continuance. If the Government has not yet learned that it must give "prompt and full compliance with this court's discovery order" (667 F.2d 7), the only sanction which can reasonably be expected to get the Government's attention is the sanction of suppressing this deposition withheld in direct violation of a Rule 16 order.

Lastly, it must be kept in mind that the Fifth Circuit in *United States v. Campagnuolo,* 592 F.2d 852 (5th Cir.1979), a case from which the Eleventh Circuit has not retreated, and in which Judge Vance participated, said:

> We are left, then, with the government's argument that the district judge should not have suppressed Fred Campagnuolo's statement because the government's noncompliance with the discovery order could not have prejudiced the appellees. *This argument misconceives the district judge's broad discretion to administer sanctions for the violation of a valid discovery order. See United States v. Bockius,* 5 Cir.1977, 564 F.2d 1193, 1196; *United States v. Valdes,* 5 Cir.1977, 545 F.2d 957, 961. We find no abuse of discretion where, as here, a district judge for *prophylactic purposes* suppresses evidence that, under a valid discovery order, the government should have disclosed earlier, even if the nondisclosure did not prejudice the defendants.

*Id.* at 858 (emphasis supplied).

Although the dereliction of the Government as to Kelso's deposition in CV 79–429 is prejudicial, *this is also a case for prophylaxis.*

### RAY WINFORD STEELE

■ Steele seeks to suppress the deposition to which he submitted on March 14, 1983, under the compulsion of Judge Haltom's order of February 8, 1983, in CV 80–HM–1449–S. Not only did Mr. Dees, Mr. Willingham and Mr. Mays (the latter of whom Steele described in his testimony on October 3, 1986, as being his lawyer in CV 80–HM–1449–S, although Mr. Mays is not reflected as having appeared for Steele on the docket sheet in CV 80–HM–1449–S), inform Steele that he could go to jail if he refused to answer Mr. Dees' questions on March 14, 1983, but Mr. Dees had much earlier told Steele during the state criminal trial of *State v. Robinson* (where Steele wisely "took the Fifth") that if Robinson were convicted Mr. Dees would see to it that Steele went to jail. On March 14, 1983, Steele had every reason to take Mr. Dees very seriously.

At page 30 of Steele's deposition, Mr. Dees said: "Are you instructing him not to answer it?" Mr. Willingham responded: "No. I can't instruct him not to answer it". At page 45 Mr. Dees said: "Do you want to instruct him not to answer? I'm going to take this up with the Court [Judge Haltom]". While Mr. Mays (Steele's lawyer?) later during the deposition made it obvious that he was aware of the Fifth Amendment and thought that it applied to some of Dees' questions, the overriding compulsion of Judge Haltom's order was brutally obvious throughout the deposition, and that compulsion resulted in many self-incriminating answers by Steele.

Nothing which the Eleventh Circuit said on June 25, 1985, in *United States v. Handley* can remotely be construed to stand for the proposition that a self-incriminating statement which is the product of compulsion exerted by a *private* actor, not acting on behalf of the Government, is admissible against the accused just because it is not the product of direct Governmental misconduct. Such a proposition would, of course, lead to the bizarre concept that a rubber hose administered by a private actor can elicit a confession which would not constitute a violation of the Fifth Amendment. The use of an *involuntary* confession is precluded by the Fifth Amendment whether it is the Government which overrides the will of the accused or it is a

private actor who overrides that will. The proper inquiry is into the *method* by which the confession was obtained, no matter who applied the screws. Not only did Mr. Dees' method include the "stick" but also the "carrot". Early in Steele's deposition at page 8 Mr. Dees said to Steele:

*I might point out that nobody in here will divulge anything you give us.*

(emphasis supplied).

The court supposes that a private investigator is not to be criticized for his prevarication and that he can with some impunity promise anything without meaning it. After making this solemn promise to Steele Mr. Dees almost immediately divulged to the Department of Justice everything Steele gave him. Fortunately for Mr. Dees it was Steele who was under oath at the time and not Mr. Dees.

Besides having been compelled by court order, Steele's deposition contains a formal stipulation, previously discussed by the court more than once, by which Steele calculatedly preserved his right to object later to any deposition question on any and every ground except "leading" and "form". This stipulation was consistent with and reinforced by Mr. Dees' promise not to divulge to others. Either this reservation has meaning and purpose, or it has no meaning and purpose. This court, as it has previously indicated, believes that this stipulation serves the salutary purpose of facilitating and expediting the taking of depositions without unnecessary court involvement and is due to be given effect, whether by the court in which the deposition is taken, or in another court.

### ROGER DALE HANDLEY

■ Handley was deposed by Mr. Dees on October 5, 1982, in another civil case then brought by Mr. Dees in the Circuit Court of Jefferson County, Alabama, entitled *Thomas Reed, et al. v. Roger Handley, et al.,* CV 82–52–642–WAT. There is no evidence that on October 5, 1982, Mr. Dees had already begun to feed information to the Department of Justice. Also, there is insufficient evidence upon which to base a conclusion that Mr. Dees' "sole purpose" for filing CV 82–52–642–WAT was to obtain information for possible future criminal indictments, although it was probably one of his purposes even on that early date. On October 5, 1982, there was no irresistible compulsion on Handley as there was on March 15, 1983, when Handley's deposition was taken in CV 80–HM–1449–S. At the deposition of October 5, 1982, Mr. Handley was represented by Mr. Hanes, a lawyer who himself at pages 42 and 43 of the deposition asked Handley certain questions eliciting answers about the Decatur incident. Mr. Hanes correctly accused Mr. Dees of "trolling" for information but did not instruct his client to refuse to answer and to assert his Fifth Amendment privilege, although the Fifth Amendment was discussed. The deposition of October 5, 1982, was not involuntary.

The deposition of October 5, 1982, did, however, contain the formal stipulation making it unnecessary to interpose objections and reserving Handley's right to interpose objections if and when the deposition were later offered. It has never been offered in CV 82–52–642–WAT, a case which apparently has slipped through the crack as has CV 80–HM–1449–S. The court concludes that this stipulation did preserve Handley's right to object *except* as to the questions asked by Mr. Hanes, who was Handley's lawyer. Thus, the answers to Mr. Dees' questions on October 5, 1982, are due to be suppressed, but the answers to Mr. Hanes' questions, even if self-incriminating, are not due to be suppressed. They were voluntary, and no right to object to them was preserved by Handley by the stipulation.

Handley's deposition taken on March 15, 1983, in CV 80–HM–1449–S was obviously involuntary. It was taken under the crushing compulsion of Judge Haltom's order. Before and during the deposition Mr. Willingham made it abundantly clear to Handley that Judge Haltom's order must be obeyed. This latter deposition is due to be suppressed.

### CONCLUSION

A separate appropriate order will be entered.

## ORDER

Based on the accompanying Memorandum Opinion, the court makes the following RULINGS:

1. Mason's motion to suppress his deposition of August 15, 1983, is GRANTED, and the said deposition is SUPPRESSED.

2. Creekmore's motion to suppress is MOOT. Insofar as Creekmore seeks to suppress prior depositions and testimony of other defendants, the court RESERVES until trial.

3. Kelso's motion to suppress his deposition in *Kelso v. Robinson,* is GRANTED, and the said deposition is SUPPRESSED. Kelso's motion to suppress his said testimony given in *State v. Robinson* is DENIED.

4. Steele's motion to suppress his deposition of March 14, 1983, is GRANTED, and the said deposition is SUPPRESSED.

5. Handley's motion to suppress his deposition of October 5, 1982, in *Reed v. Handley,* CV 82–52–642–WAT, is GRANTED as to Mr. Dees' questions and DENIED as to Mr. Hanes' questions, and his motion to suppress his deposition of March 15, 1983, in CV 80–HM–1449–S is GRANTED, and the said depositions, or portions thereof, are SUPPRESSED accordingly.