846 F.2d 678
 26 Fed. R. Evid. Serv. 191
 UNITED STATES of America, Plaintiff-Appellant,
v.
Lenwood Lewis WHITE, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
Terry Joe TUCKER, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
William Johnny MASON, Roger David Handley, David Lee Kelso,
and Ray Winford Steele, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
William David RICCIO, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
Ricky Lynn CREEKMORE, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
David Lee KELSO, Defendant-Appellee.
 Nos. 86-7672, 86-7699, 86-7721, 86-7834, 86-7901, 87-7098.
 United States Court of Appeals,
Eleventh Circuit.
 June 7, 1988.
 
 Frank W. Donaldson, U.S. Atty., Birmingham, Ala., William R. Yeomans, Asst. Atty. Gen., Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., Ann C. Robertson, Sp. Asst. U.S. Atty., Birmingham, Ala., for plaintiff-appellant in Nos. 86-7672, 87-7098.
 Kenneth J. Gomany, Birmingham, Ala., for defendant-appellee White.
 William R. Yeomans, Asst. Atty. Gen., Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant in Nos. 86-7699, 86-7721, 86-7834.
 Thomas J. Spina, Hartman, Fawal & Spina, Robert P. Bynon, Jr., Birmingham, Ala., for defendant-appellee Tucker.
 F.A. Barry Flower, III, Birmingham, Ala., for defendant-appellee Mason.
 John W. Sudderth, Birmingham, Ala., for defendant-appellee, Handley.
 George C. Lucas, Birmingham, Ala., for defendant-appellee Kelso.
 Mark Ellis Martin, Birmingham, Ala., for defendant-appellee Steele.
 Jerry N. Quick, Trussville, Ala., for defendant-appellee Riccio.
 Frank W. Donaldson, U.S. Atty., Birmingham, Ala., William R. Yeomans, Asst. Atty. Gen., Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant in No. 86-7901.
 Donald L. Colee, Jr., Birmingham, Ala., for defendant-appellee Creekmore.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before JOHNSON and CLARK, Circuit Judges, and DUMBAULD*, Senior District Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 This appeal consists of six consolidated criminal cases, involving eight defendants, in which the United States ("the Government") seeks the reversal of the district court's suppression of evidence. The Government also appeals from the district court's order dismissing the indictment against David Lee Kelso and from the district court's granting Ricky Lynn Creekmore a judgment of acquittal after the jury had found Creekmore guilty of one count of the indictment. We reverse the district court and remand to the Chief Judge of the United States District Court for the Northern District of Alabama with instructions that these cases be assigned to a different district court judge.
 
 I. FACTS
 
 2
 These cases, which have a long procedural history, arise out of a single incident. In May 1979, members of the Invisible Empire, Knights of the Ku Klux Klan clashed with black marchers led by the Southern Christian Leadership Conference ("SCLC") in Decatur, Alabama. Approximately two or three days before the march, Reverend Arthur Turner and other SCLC leaders met with Decatur Chief of Police Pack Self to discuss the details of the parade route and to request police assistance during the demonstration. Chief Self agreed to provide security during the march and said that he would bring in extra officers if necessary. In fact, an augmented police force was in the streets on the day in question. Night shift officers remained on duty or returned later in the morning, and the Morgan County Sheriff's Department had an auxiliary staff on duty.
 
 
 3
 On the day of the demonstration, the Ku Klux Klan gathered in Decatur. As the SCLC march progressed, KKK members moved into the street. The police attempted to push the Klan out of the street, but the Klan members beat the police with clubs.[1] At least one member of the Klan, defendant Kelso, broke through the police line and ran toward the black protestors. However, he was shot before he reached the demonstrators. Other shots were then fired, at which time the black marchers fled.
 
 
 4
 Several persons, including police officers, sustained injuries in the clash, but the FBI's initial investigation did not disclose sufficient evidence to support federal criminal charges against any of the Klansmen. Consequently, the Department of Justice ("the Department") closed its investigation in late October 1979.
 
 
 5
 In September 1980, the State of Alabama prosecuted Curtis Robinson, a black demonstrator, for shooting and wounding Kelso during the Decatur clash. Robinson v. State, 430 So.2d 883 (Ala.Cr.App.1983). Defendants Kelso and Terry Tucker both testified at the criminal trial. United States v. Handley, 644 F.Supp. 1165, 1190 (N.D.Ala.1986) ("Handley III "); United States v. Mason, 646 F.Supp. 843, 850-51 (N.D.Ala.1986). In addition, in December 1979, Kelso gave a deposition in conjunction with a tort action he brought against Robinson. Id. at 851. Robinson was represented by Attorney Morris Dees and the Southern Poverty Law Center ("SPLC") in these cases.
 
 
 6
 In November 1980, the SPLC filed a civil action in the United States District Court for the Northern District of Alabama seeking monetary and injunctive relief against the Invisible Empire, Knights of the Ku Klux Klan and its members for various activities, including the violence in Decatur.[2] The SPLC also asked the district court to "refer to the United States Attorney for the Northern District of Alabama, for investigation and possible prosecution, any acts of defendants which appear to be violations of federal criminal statutes." United States v. Handley, 763 F.2d 1401, 1403 (11th Cir.), cert. denied, 474 U.S. 951, 106 S.Ct. 318, 88 L.Ed.2d 301 (1985) ("Handley II "). District Judge Haltom presided over the civil action. Among the approximately fifty defendants in the SPLC's civil suit are Lenwood Lewis White, William Johnny Mason, Roger David Handley, Ray Winford Steele, William David Riccio, Tucker, Kelso, and Creekmore.[3] Id. at 1403. These civil defendants are also the criminal defendants in these consolidated cases.
 
 
 7
 On October 20, 1982, Lloyd Letson, a former Klansman, testified at a hearing on behalf of the plaintiffs in the civil action. The plaintiffs had dismissed him from the civil suit in return for his testimony regarding the alleged Klan conspiracy in Decatur. An Assistant United States Attorney (AUSA), Henry Frohsin, attended the hearing, and obtained a transcript of Letson's testimony to send to the Department in Washington. The Department subsequently reopened its investigation in December 1982. Id.
 
 
 8
 On January 27, 1983, Dees began to depose the civil defendants. During the depositions, Dees showed the deponents photographs of the Decatur incident and asked them to identify themselves and other Klansmen depicted in the photographs. Many deponents refused, invoking their Fifth Amendment right to refrain from self-incrimination. On February 8, 1983, in response to a motion from the SPLC, Judge Haltom ordered the deponents to identify themselves and other KKK members in the photographs taken in Decatur and at other sites of Klan activity. Id.
 
 
 9
 On July 27, 1983, Dees met with representatives of the FBI and the Department.[4] Daniel Rinzel, a Deputy Assistant Attorney General in the Department's Civil Rights Division, told Dees that the Department would be willing to accept any information regarding the Klan that Dees had to offer. Dees gave Rinzel excerpts of some of the 12 depositions he had taken to that point. After the meeting, Dees took approximately 90 depositions and forwarded to the Department those depositions indicating criminal activity by the KKK. Id. at 1404. However, the Department "had no advance notice of any of the depositions and no input into their conduct." Id. at 1403. During this period, the Department obtained other depositions directly from the district court clerk. Id. at 1404.
 
 
 10
 In May 1984, the grand jury indicted nine defendants, eight of whom are appellees here,[5] for conspiring to disrupt the Decatur parade, for injuring police officers, and for conspiring to obstruct the investigation of the incident. Prior to trial, seven of the nine defendants moved to suppress all depositions and fruits of depositions taken in the SPLC's civil action. District Judge Acker granted the motion, stating that the SPLC coerced the defendants into incriminating themselves and that, because the SPLC was the arm of the Government in this investigation, the depositions were taken in violation of the Fifth Amendment. United States v. Handley, 591 F.Supp. 1257 (N.D.Ala.1984) ("Handley I "). This Court reversed, stating that "[t]he Government may introduce the depositions into evidence at trial pursuant to [Fed.R.Crim.P.] 15(e) and the Federal Rules of Evidence, assuming satisfaction of confrontation concerns." Handley II, 763 F.2d at 1406.
 
 
 11
 On remand, the district court granted the defendants' motions to sever and it set a trial date for each defendant. In August 1986, the district court held a hearing to address the voluntariness of defendant Tucker's civil deposition and his testimony in the state criminal prosecution of Curtis Robinson. The district court held that the SPLC deposition was inadmissible. Handley III, 644 F.Supp. at 1189-90. In addition, the court suppressed Tucker's testimony in State v. Robinson, holding that it was involuntary and violative of the Fifth Amendment and that the Government obtained knowledge of the testimony only as the fruit of the involuntary SPLC deposition. Id. at 1200.
 
 
 12
 In September 1986, the district court held another evidentiary hearing, after which it granted defendant White's motion to suppress his SPLC deposition. United States v. White, 643 F.Supp. 1067 (N.D.Ala.1986). Likewise, in October 1986, the court suppressed the SPLC depositions of Mason, Steele, and Handley as involuntary. Mason, 46 F.Supp. at 856. In the same order, the district court suppressed the deposition given by Kelso in his tort action against Robinson, id. at 853-54, and it suppressed portions of a deposition taken of Handley in Reed v. Handley, a separate civil action brought by Dees in an Alabama circuit court. Id. at 855. Regarding this latter deposition, the district court held that the responses to Dees' questions would be suppressed, but Handley's answers to questions asked by his own attorney were voluntary. Although Handley was not forced to answer any of Dees' questions over his assertion of the Fifth Amendment, the court held that a stipulation in the deposition, which rendered it unnecessary for parties to make objections during the deposition, preserved Handley's Fifth Amendment rights. Id.
 
 
 13
 On October 22, 1986, the district judge then ordered the Government to show cause (1) why Tucker's case should not proceed to trial before the Government appealed the suppression order, and (2) why the cases against Kelso and Handley should not be dismissed for want of prosecution. After the Government responded, the court agreed to stay the Tucker and Handley cases pending appeal, but it stated that the Government should proceed to trial in Kelso without the suppressed evidence. United States v. Tucker, 646 F.Supp. 1543, 1544 (N.D.Ala.1986) ("Tucker I "). On November 19, 1986, the district court dismissed the indictment against Kelso because of the Government's "failure to prosecute" and because of its failure to produce the name of an unindicted co-conspirator. United States v. Kelso, 648 F.Supp. 1271, 1272, 1277 (N.D.Ala.1986).
 
 
 14
 Also in November 1986, a jury found defendant Creekmore, who had not given any pretrial depositions or testimony subject to suppression, guilty of conspiring to violate the civil rights of the Decatur marchers as protected by 18 U.S.C.A. Sec. 245(b)(2)(B). Nonetheless, on November 26, 1986, the district judge granted Creekmore's motion for judgment of acquittal on the ground that the evidence failed to demonstrate that the SCLC parade was "provided by" or "administered by" the city of Decatur, as required by the statute. United States v. Creekmore, 648 F.Supp. 1369, 1371 (N.D.Ala.1986).
 
 
 15
 Finally, on November 21, 1986, the district court suppressed Riccio's two SPLC depositions as involuntary. United States v. Riccio, 648 F.Supp. 1280, 1283 (N.D.Ala.1986). From all these adverse rulings, the Government appealed. The cases are now consolidated.
 
 II. DISCUSSION
 A. Involuntariness of Depositions
 
 16
 The Government contends that the district court committed error by suppressing the depositions of the defendants taken in the SPLC's civil action. The Government asserts several grounds on which to reverse the district court, but its initial contention is that the law of the case precluded the district court from reconsidering the voluntariness of the SPLC depositions of Handley, Steele, Riccio, Tucker, White, and Mason.[6]
 
 1. Law of the Case
 
 17
 The doctrine of the law of the case mandates that "an appellate court decision on an issue ... be followed in all subsequent trial court proceedings in the same case." Leggett v. Badger, 798 F.2d 1387, 1389 (11th Cir.1984) (per curiam); Wheeler v. City of Pleasant Grove, 746 F.2d 1437, 1440 (11th Cir.1984) (per curiam). This applies to the appellate court's findings of fact and conclusions of law. Id. at 1440. Moreover, even though the law of the case does not extend to issues the appellate court did not address, Piambino v. Bailey, 757 F.2d 1112, 1120 (11th Cir.1985), cert. denied, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986), it encompasses matters decided by necessary implication by this Court. Wheeler, 746 F.2d at 1440.
 
 
 18
 The purpose of the law of the case doctrine is to bring an end to litigation. In addition, it ensures that district courts obey appellate courts and that the parties are not required to relitigate settled issues. Id. With these principles in mind, we compare the district court's current set of opinions suppressing the depositions with its earlier decision and with the initial decision of this Court. See id. This comparison clearly demonstrates that the district court violated the law of the case.
 
 
 19
 In its first memorandum opinion suppressing the SPLC depositions, the district court concluded that, under the totality of the circumstances, no defendant had intelligently and voluntarily waived his Fifth Amendment rights. Handley I, 591 F.Supp. at 1267. The district court also held that the SPLC was the arm of the Government in this investigation and that any SPLC misconduct should be attributed to the Government. Id. at 1268-69. Because the district court concluded that the SPLC compelled the defendants to testify in the depositions, the court suppressed the depositions as violative of the Fifth Amendment. Id. at 1268.
 
 
 20
 This Court reversed the suppression order, holding that any compulsion exerted by the SPLC against the civil deponents could not be imputed to the Government. Handley II, 763 F.2d at 1406. We found that the civil case was a viable action apart from the benefits it provided to the criminal investigation and that the SPLC did not bring the civil action solely to obtain evidence for the criminal prosecution. Id. at 1405.[7] Accordingly, we held that the Government could introduce the depositions at trial, as long as the confrontation clause was satisfied. Id. at 1406.
 
 
 21
 On remand, the district court held a new series of suppression hearings regarding the depositions because it said that no court had determined (1) whether the SPLC depositions were given voluntarily within the requirements of the Fifth Amendment, or (2) whether the deponents knowingly waived their Fifth Amendment rights. Handley III, 644 F.Supp. at 1171. This was clearly incorrect. In Handley II, we rejected the district court's conclusion that the depositions violated the Fifth Amendment. By reversing the suppression of the evidence, Handley II decided, at least implicitly, that the depositions were not involuntary within the context of the Fifth Amendment. See Wheeler, 746 F.2d at 1440. Thus, the Fifth Amendment voluntariness issue is part of the law of the case.
 
 
 22
 However, the inquiry does not end here. Three exceptions to the law of the case doctrine exist. A federal district court can act contrary to an appellate decision: "(1) when new and substantially different evidence is presented subsequent to the appeal; (2) when controlling authority has been rendered, contrary to the law of the appellate decision; [and] (3) when the prior decision was clearly erroneous and would work a manifest injustice if implemented." Leggett, 798 F.2d at 1389. This Court reads these exceptions narrowly, requiring district courts to apply the law of the case unless one of the exceptions "specifically and unquestionably applies." See id. at 1389 n. 2.
 
 
 23
 It is evident that the district court realized that Handley II foreclosed a new voluntariness determination because it found in the alternative that two exceptions to the law of the case doctrine applied in these cases. First, the court stated that a change in controlling authority required suppression of the depositions. As "controlling authority," the district court cited Erwin v. Price, 778 F.2d 668 (11th Cir.1985), in which a police officer was discharged for refusing to answer questions asked by government investigators in an internal investigation. Erwin held that "where there is a formal disciplinary investigation during which a public employee is ordered to answer proper questions under threat of dismissal, coercion is presumed and the government bears the burden of demonstrating voluntariness." Id. at 670. The district court did not explain how this represents a change in controlling authority relevant to the present cases. Apparently, the court cited Erwin for the proposition that the government must demonstrate the voluntariness of answers given to official questions. However, Erwin dealt with a public employee's statement in conjunction with a work-related disciplinary proceeding. This has no application in the present context where a nongovernmental actor allegedly coerced the defendants.
 
 
 24
 A similar criticism can be addressed to the second case that the lower court identified as contrary "controlling authority." In Crane v. Kentucky, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), the Supreme Court held that evidence regarding the circumstances under which the police obtained a defendant's confession should be submitted to the jury even though the trial court had already determined that the confession was voluntary. The Supreme Court stated that, because this evidence bears on the reliability and credibility of the confession, the jury should hear it. Id. at 2145. However, Crane did not discuss the standard for determining whether a confession is voluntary; it merely emphasized that the trial court must determine the voluntariness of a custodial confession. Moreover, Crane did not hold that the Fifth Amendment could be violated by the conduct of private actors who are not associated with the government. Because neither of the cases cited by the district court controls the issues in these consolidated cases, the narrow exception to the law of the case doctrine for intervening authority does not "specifically and unquestionably apply." See Leggett, 798 F.2d at 1389 n. 2.
 
 
 25
 In addition to the controlling authority exception, the district court invoked the exception to the law of the case doctrine which allows a district court to act contrary to an appellate decision where substantial new evidence was presented on remand. See, e.g., United States v. Tucker, 648 F.Supp. 1277, 1278 (N.D.Ala.1986) ("Tucker II "); White, 643 F.Supp. at 1069-70. The district court stated that the new evidence demonstrated that Morris Dees was, in fact, the Government's agent, and that the SPLC's sole purpose in filing its civil action was to obtain criminal indictments.
 
 
 26
 The purportedly new evidence consisted of former Klansman Lloyd Letson's testimony at the Creekmore trial and certain aspects of Dees' behavior during the pendency of the civil and criminal cases. First, Letson testified that he and Dees had visited the office of AUSA Frohsin on October 20, 1982, when Letson testified at a hearing in the SPLC civil action. Dees allegedly told Letson that he would have nothing to worry about if he told Frohsin the truth, and Letson understood this to mean that he would receive immunity. Although Letson also testified that neither Frohsin nor Dees mentioned immunity, Tucker II, 648 F.Supp. at 1279, the district court concluded that this testimony indicated that Dees was Frohsin's agent, that Dees offered immunity on behalf of the Government, and that the sole purpose of the civil action was to obtain evidence for the criminal prosecution. Id. at 1279-80. As further evidence of the partnership between the Department and Dees, the court noted that Frohsin attended the hearing at which Letson testified, demonstrating that Frohsin knew what Dees was doing as early as 1982.
 
 
 27
 This does not constitute "substantially different evidence" from that relied upon previously by the district court. In 1984, Dees testified that he had visited Frohsin's office on October 20, 1982, because Frohsin was representing an FBI agent who Dees intended to call at the hearing. While in the office, Dees told Frohsin that someone from the Department should attend the hearing to listen to Letson's testimony. Thus, the record does not suggest that there was an illicit partnership between Dees and Frohsin. The district judge's new finding is based in part on evidence that was in the record before this Court in 1985.[8] Moreover, even if Letson was correct in inferring that Dees would attempt to get him immunity, that does not mean that Dees had the prior approval of the Government.
 
 
 28
 As further evidence of its conclusion that the SPLC's sole purpose was to obtain indictments, the district court pointed to White's claim that an SPLC investigator promised to "go light" on him if he cooperated. White, 643 F.Supp. at 1070. The district court concluded that this promise referred to criminal prosecution, id., but these statements, if made, most likely applied to the civil litigation. For example, the SPLC dismissed Letson and other defendants from the civil action in return for their cooperation.[9]
 
 
 29
 As an additional example of new evidence of the agency relationship between Dees and the Government, the district court relied on Dees' so-called "Freudian slip" made during his testimony on October 3, 1986. At that hearing, Dees responded to a question from Judge Acker by saying, "We charged that ..." Because Dees used the word "charged," the district court found that "Dees was inadvertently identifying himself with the Department of Justice." Mason, 646 F.Supp. at 848. This is clearly erroneous. Our examination of the transcript indicates that Dees merely referred to what he labelled the "charges" in his civil complaint. The district judge failed to quote the portion of the exchange between Dees and the court which demonstrated that Dees was not referring to the Department's criminal charges.[10] Consequently, the district judge did not present an accurate portrait of the testimony.
 
 
 30
 Importantly, the district court's various opinions do not disclose any new evidence demonstrating that any government official discussed immunity with the defendants or directed or influenced the taking of depositions by the SPLC.[11] Thus, no evidence cited by the district court suggests that Dees was an agent of the Department so as to require an exception to the application of the law of the case doctrine. Moreover, the lower court failed to uncover any substantially new evidence suggesting that the SPLC's sole purpose in filing its civil suit was to obtain evidence for the criminal prosecution.[12]
 
 
 31
 Because no substantially different evidence or contrary controlling authority brings these cases within the narrow exceptions to the law of the case doctrine, we reverse the district court's orders suppressing the SPLC depositions of Tucker, Steele, Handley, Riccio, White[13] and Mason.[14]
 
 2. Other Issues
 
 32
 Although we reverse the suppression of the SPLC depositions as violative of the law of the case, we address the district court's additional errors so as to provide guidance to the judge in further proceedings. In addition, these errors impact on other evidence which the district court suppressed.
 
 
 33
 In these cases, the lower court's approach to the Fifth Amendment was fundamentally flawed. At one juncture, the district judge stated that "[t]he use of an involuntary confession is precluded by the Fifth Amendment whether it is the Government which overrides the will of the accused or it is a private actor who overrides that will." Mason, 646 F.Supp. at 854-55. This is an erroneous statement of law. See Handley II, 763 F.2d at 1405 ("Impropriety in the taking of these depositions will authorize their suppression under the [F]ifth [A]mendment if and only if such conduct may be imputed to the Government"). The Supreme Court has emphasized that "[t]he sole concern of the Fifth Amendment ... is governmental coercion." Colorado v. Connelly, 79 U.S. 157, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986). Since only governmental coercion can result in suppression of statements as violative of the Fifth Amendment, the lower court's approach to this issue is clearly incorrect. Contrary to the district judge's assertion that the "proper inquiry is into the method by which the confession was obtained, no matter who applied the screws,"Mason, 646 F.Supp. at 855, the actual inquiry must be directed toward determining whether the Government, or its agent, coerced a confession. Connelly, 107 S.Ct. at 522-23.
 
 
 34
 The lower court also committed error by relying heavily on its finding, contrary to this Court's determination, that the SPLC's sole purpose for deposing the defendants was to obtain evidence for the criminal prosecution. Even if Dees' sole motive was to help indict the defendants, his behavior may not be imputed to the Government for the purposes of suppression under the Fifth Amendment. As Connelly emphasized, "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant" does not render that evidence inadmissible. 107 S.Ct. at 521. Since Dees was acting in his capacity as a private citizen, his motives or tactics were irrelevant to the question whether the Government could use the evidence he collected.[15]
 
 
 35
 Beyond its errors in imputing the behavior of the SPLC to the Government, the district court also applied an incorrect standard in assessing whether the SPLC depositions were taken in violation of the Fifth Amendment. On remand, the district judge required the Government to carry the burden of proving that each deposition was given voluntarily. Handley III, 644 F.Supp. at 1174. This is the standard applicable when the Government wants to use statements made during a custodial interrogation. See Garner v. United States, 424 U.S. 648, 657, 96 S.Ct. 1178, 1183, 47 L.Ed.2d 370 (1976) (government must demonstrate that defendant in a custodial interrogation voluntarily waived his Fifth Amendment rights). The reasoning behind this rule is that, "without proper safeguards the circumstances of custodial interrogation deny an individual the ability freely to choose to remain silent ... [A]ny pressures inherent in custodial interrogation are compulsions to incriminate, not merely compulsions to make unprivileged disclosures." Id. For this reason, a defendant in custody must knowingly and voluntarily waive his Fifth Amendment privilege.
 
 
 36
 The same concerns do not exist when interrogation does not occur in custody. In a non-custodial interrogation, "an individual may lose the benefit of the privilege without making a knowing and intelligent waiver." Id. at 654 n. 9, 96 S.Ct. at 1182 n. 9; Minnesota v. Murphy, 465 U.S. 420, 428, 104 S.Ct. 1136, 1142, 79 L.Ed.2d 409 (1983). Therefore, in this case, no justification exists for requiring the Government to bear the burden of proving that the defendants voluntarily waived their Fifth Amendment protections. None of the defendants was in custody at the time that any of the suppressed statements was made. None of the depositions was conducted so as to restrain the defendants, and no government officials were present. Even though the deponents were "compelled" by subpoena to appear and give depositions in the SPLC's civil action, the Government's use of any disclosures made by the defendants does not violate the Fifth Amendment. Where the witness fails to claim the privilege, "the government has not 'compelled' him to incriminate himself." Murphy, 465 U.S. at 427, 104 S.Ct. at 1142 (quoting Garner, 424 U.S. at 654, 96 S.Ct. at 1182). Accordingly, the district court erred in requiring the Government to demonstrate that the defendants knowingly waived their Fifth Amendment privileges with respect to the suppressed statements.
 
 
 37
 In addition, the district court erred in holding that the defendants preserved their Fifth Amendment privileges by stipulating in their depositions that objections could be made at trial.[16] The district court relied on this as a ground for suppressing: (1) the SPLC depositions of White, Mason, Riccio, and Steele; (2) the responses Handley gave to Dees' questions in the deposition in Reed v. Handley; and (3) Kelso's deposition in Kelso v. Robinson. There are several problems with this ruling. First, it ignores the settled principle which requires a witness to assert his Fifth Amendment rights. A witness who testifies at any proceeding, instead of asserting his Fifth Amendment rights, loses the privilege. Murphy, 465 U.S. at 427, 104 S.Ct. at 1142; Garner, 424 U.S. at 654-55, 96 S.Ct. at 1182. A civil deponent cannot choose to answer questions with the expectation of later asserting the Fifth Amendment.[17] Second, the boilerplate stipulation in these depositions is designed to allow a party to object on evidentiary grounds at trial. It does not address privileged material, which is not discoverable. See Fed.R.Civ.P. 26(b)(1). The assertion of a privilege is not the same as an evidentiary objection. Third, the defendants and their attorneys asserted their Fifth Amendment rights at various times during the depositions. This suggests that the defendants understood that the stipulation did not protect their Fifth Amendment rights. For these reasons, the district court's holding that the stipulations relieved the defendants of their obligation to invoke the Fifth Amendment during the depositions was error. The defendants cannot rely on these stipulations to preserve their Fifth Amendment rights.[18]
 
 
 38
 B. Voluntariness of Tucker's Trial Testimony
 
 
 39
 Next, the Government contends that Tucker's testimony in State v. Robinson should not have been suppressed as involuntary. Our reversal of the district court on this issue requires little elaboration beyond our discussion of the voluntariness issue above.
 
 
 40
 The district court held that Tucker was "forced" to testify because he was subpoenaed and sworn to tell the truth before the judge; therefore, his testimony was not voluntary. Handley III, 644 F.Supp. at 1200. This holding ignores fundamental principles of law. Tucker was in the position of:
 
 
 41
 the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt, unless he invokes the privilege and shows that he faces a realistic threat of self-incrimination. The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege.
 
 
 42
 Murphy, 465 U.S. at 427. Since Tucker was not required to testify over a valid claim of the Fifth Amendment, his testimony was not compelled. That Tucker was not represented by an attorney is irrelevant.[19] The lower court should have concluded that Tucker lost his Fifth Amendment privilege by failing to assert it. See id.[20]
 
 C. Untimely Production of Statements
 
 43
 The Government's next contention is that Judge Acker erred in suppressing statements made by Tucker and Kelso on the ground that the Government had failed to produce them in a timely manner. Both statements were produced prior to trial and the Government asserts that neither defendant was prejudiced.
 
 
 44
 Fed.R.Crim.P. 16(a)(1)(A) requires the Government to produce, upon a defendant's request, any recorded statements made by the defendant that are in the Government's possession. If a party fails to comply with Rule 16, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed.R.Crim.P. 16(d)(2). A district court's decision to impose a sanction for violation of a discovery order will not be disturbed by this Court absent an abuse of discretion. United States v. Euceda-Hernandez, 768 F.2d 1307, 1311-12 (11th Cir.1985); United States v. Burkhalter, 735 F.2d 1327, 1329 (11th Cir.1984) (per curiam).
 
 
 45
 In exercising its discretion to impose a discovery sanction, the district court must weigh several factors, including the reasons for the Government's delay, the extent of the prejudice that the defendant has suffered because of the delay, and the feasibility of curing such prejudice by granting a continuance. Euceda-Hernandez, 768 F.2d at 1312; Burkhalter, 735 F.2d at 1329. If the court decides after weighing these factors that a sanction is appropriate, it should impose "the least severe sanction that will accomplish the desired result--prompt and full compliance with the court's discovery orders." Euceda-Hernandez, 768 F.2d at 1312 (quoting United States v. Sarcinelli, 667 F.2d 5, 7 (5th Cir. Unit B 1982)).
 
 1. Tucker's Statements
 
 46
 The district court relied on its authority to impose sanctions under Fed.R.Crim.P. 16 as an independent ground for suppressing Tucker's testimony in State v. Robinson. See Handley III, 644 F.Supp. at 1195. Not until August 6, 1986, did the Government arrange to transfer a copy of this testimony to Tucker's counsel. The Government actually produced this material on August 20, 1986, five days before Tucker's trial was scheduled to begin. Id. at 1192. The Government explains that it neglected to produce the testimony earlier because its attention was turned from Tucker's case during the extensive appellate process in these six cases. Appellant's Brief at 70.
 
 
 47
 Although the Government's late production violates Rule 16, any prejudice to Tucker could have been allayed by granting a continuance. As this Court has stated, "The presence of a clear violation of a discovery order does not excuse a trial judge from weighing the factors cited above and imposing the least severe, but effective, sanction." Euceda-Hernandez, 768 F.2d at 1312. The district court failed to do this. Suppression of the evidence was not the least severe method of ensuring that the Government complies with discovery orders. A continuance would have allowed the defendant additional time to incorporate the testimony into his case so as to attempt to alleviate any prejudice. This Court has emphasized that the purpose of Rule 16 is to promote the fair administration of justice, but suppressing the evidence, rather than granting a continuance, works against that goal. Id. In addition, the transcript of Tucker's testimony was a public document which was equally available to the Government and the defendant. In cases involving Brady material, this Court has held that the Government does not violate Rule 16 if it fails to provide the defendant with discovery material that the defendant could have obtained as easily as the Government. See United States v. McMahon, 715 F.2d 498, 501 (11th Cir.), cert. denied, 464 U.S. 1001, 104 S.Ct. 507, 78 L.Ed.2d 697 (1983). Consequently, the district court abused its discretion in suppressing Tucker's testimony. Had the district judge weighed the factors deemed important in Euceda-Hernandez, he would not have suppressed the statements.[21]
 
 2. Kelso's Statements
 
 48
 The district court also suppressed Kelso's deposition taken in the Kelso v. Robinson tort action because the Government failed to produce it until October 2, 1986, one day before the suppression hearing. The court held that this was an egregious violation of Rule 16, even though the trial was still five weeks away and the Government "believed" that it had furnished the deposition earlier. Mason, 646 F.Supp. at 852.[22] Despite the Government's mistaken "belief," the district court found that there was no satisfactory explanation for the Government's tardy disclosure, that Kelso was prejudiced, and that a continuance could not rectify the prejudice. Id. at 854. The district court stated that even though the trial was five weeks away, Kelso's attorney may have made many strategic decisions in the period between the indictment and the suppression hearing, and his strategy may have been different had he known of the deposition.
 
 
 49
 However, contrary to the lower court's assumption, Mason, 646 F.Supp. at 853, Kelso's attorney, George Lucas, knew or should have known about Kelso's deposition as early as 1984. Lucas was present at a 1984 deposition taken of Morris Dees in which Dees told Robert Bynon, Tucker's attorney, that the SPLC had deposed Kelso in conjunction with the tort suit. Therefore, Kelso and his attorney had reason to know about this deposition, and they should have consulted it in preparation for this case. Moreover, no actual prejudice was demonstrated as a result of the Government's failure to make an earlier disclosure.
 
 
 50
 The district court relied on Campagnuolo for the proposition that actual prejudice is not a necessary prerequisite to suppression where evidence is suppressed for prophylactic purposes. Mason, 646 F.Supp. at 854. However, as in Euceda-Hernandez, Campagnuolo is distinguishable. In this case, the Government did not intentionally withhold Kelso's deposition; it "believed" that the deposition had already been produced. As in Tucker's case, Euceda-Hernandez suggests that suppression is too severe a remedy here, especially since the court merely assumed that there was prejudice. With five weeks to go to trial, the defendant could not have been severely prejudiced by the late production of a deposition which he knew existed. Moreover, a continuance would have alleviated any potential actual prejudice. Therefore, the district court abused its discretion by suppressing the deposition.
 
 D. Dismissal of Indictment
 
 51
 The Government also appeals the district court's dismissal of the indictment against Kelso. After the district judge suppressed Kelso's deposition, the Government appealed. The trial court then ordered the Government to proceed to trial. Tucker I, 646 F.Supp. at 1549. When the Government refused to go to trial before appealing the suppression order, the district court dismissed the indictment for failure to prosecute and for the additional reason that the Government had violated a discovery order by failing to reveal to Kelso the name of an unindicted co-conspirator. Kelso, 648 F.Supp. at 1272, 1276.[23]
 
 
 52
 A district court may dismiss an indictment pursuant to the federal courts' supervisory power. However, "dismissal of an indictment for prosecutorial misconduct is an 'extreme sanction which should be infrequently utilized.' " United States v. Pabian, 704 F.2d 1533, 1536 (11th Cir.1983) (quoting United States v. Owen, 580 F.2d 365, 367 (9th Cir.1978)). In this case, the Government merely pursued an appeal from the suppression of evidence it deemed vital to its case. This conduct is not "flagrant, prosecutorial abuse" of the criminal justice system requiring dismissal of the indictment. See United States v. Hyder, 732 F.2d 841, 845 (11th Cir.1984).
 
 
 53
 As a second reason for dismissing the indictment, the district court pointed to the Government's failure to reveal to Kelso the name of an unindicted co-conspirator, Jerry Smith. However, absent a discovery order, the prosecution has no general obligation to disclose the names of unindicted co-conspirators who will not be called as witnesses. See United States v. Barrentine, 591 F.2d 1069 (5th Cir.), cert. denied, 444 U.S. 990, 100 S.Ct. 521, 62 L.Ed.2d 419 (1979). The district court's contrary understanding, Tucker II, 648 F.Supp. at 1273, resulted from its misstatement of the magistrate's discovery order. The court stated that the United States magistrate had granted the motions of defendants Godfrey, Steele, and Riccio which requested that the Government disclose the names of unindicted co-conspirators. Id. In fact, the magistrate denied this motion, "except to the extent that the government ha[d] already furnished certain particulars." R4-173. Thus, the Government was not under a discovery order to provide additional information. Furthermore, Kelso never requested the names of unindicted co-conspirators.[24] For both these reasons, the Government was under no obligation to provide the names of unindicted co-conspirators to Kelso.[25]
 
 E. Creekmore's Judgment of Acquittal
 
 54
 The next issue on appeal concerns the Government's claim that the district court erred in granting Creekmore a judgment of acquittal after the jury found him guilty of conspiring to violate 18 U.S.C.A. Sec. 245(b)(2)(B).[26] The district judge held that the Government had failed to prove an essential element of the criminal violation; that is, the Government did not demonstrate that the parade was "provided or administered by" the city of Decatur within the meaning of Section 245(b)(2)(B). Creekmore, 648 F.Supp. at 1371.
 
 
 55
 The only case discussed by the parties and the district court which interprets this provision of the statute is United States v. Griffin, 585 F.Supp. 1439 (M.D.N.C.1983). Griffin involved a prosecution of KKK members for violating the civil rights of demonstrators engaged in a parade in Greensboro, N.C. The Griffin court held that the parade was "administered by" Greensboro because city ordinances contained requirements and regulations which were applicable to parades and which defined the responsibilities and functions of both parade participants and the city. The Griffin court reasoned that "[t]he thorough involvement of the city in the details of the parade, and the city's close supervision and control of the march, qualifies this parade as having been 'administered' by the city." Id. at 1442.
 
 
 56
 At Creekmore's trial, the Government introduced evidence that the city of Decatur had enacted three ordinances in 1978 and 1979 to respond to continuing civil rights demonstrations. One ordinance granted the Chief of Police authority to regulate unlawful public assemblies to prevent breaches of the peace. Creekmore, 648 F.Supp. at 1370 n. 1. A second regulation prohibited groups from loitering so as to obstruct a public street. Id. A third law restricted the possession of firearms by persons at a public demonstration. Id. at 1371. The Government argues that these ordinances, combined with Chief Self's close involvement with the details of the parade and his provision of security for the demonstrators, indicates that the march was "administered by" the city within the meaning of the statute.
 
 
 57
 The witness Turner of the SCLC testified that he met with Chief Self during the week preceding the demonstration to discuss the time and route of the parade, and the number of participants and vehicles that might accompany the march. Chief Self agreed to provide protection for the marchers, and extra officers were called in for this purpose. On the day of the demonstration, the police closely observed the Klan gathering and kept the streets open for the parade. Some officers were assigned to travel along the parade route to prevent interference with the protest. Ultimately, when the Klan intervened in the march, the police attempted to clear the KKK out of the street.
 
 
 58
 Despite these official acts, the district court stated that the Decatur police had not provided any special service because the police are always bound to protect the public. Creekmore, 648 F.Supp. at 1374. The district court declined to adopt the reasoning of the court in Griffin because the Griffin protestors had obtained a parade permit whereas the SCLC did not. The court held that the ordinances cited by the Government were not sufficient to establish the "functional equivalent of a parade permit," id. at 1375, which the district court deemed to be an essential prerequisite to a determination that the parade was provided or administered by the city. Id. at 1371. The court reached this conclusion even though it recognized that Decatur did not have an ordinance requiring a parade permit.
 
 
 59
 While the existence of a parade permit was considered important by the Griffin court, we do not believe that protestors who lack such a permit are outside the coverage of the statute, especially when the town, city, or county involved does not require that protestors obtain a parade permit. Furthermore, the district court's holding that the Decatur parade was not administered by the city because the dictionary definition of "administer" is "to direct" or "to have charge of," and the Decatur police were not in charge of the demonstration, id. at 1372, is too simplistic.[27] Under this rationale, no demonstration would be covered by the statute because police and city officials will rarely, if ever, "direct" a protest.[28]
 
 
 60
 More importantly, this holding ignores the legislative history of Section 245. "Racially motivated violence during parades, marches, and demonstrations was precisely what this act was designed to redress." Griffin, 585 F.Supp. at 1446. The statute must be construed to achieve its broad remedial purpose. United States v. Gilbert, 813 F.2d 1523, 1527 (9th Cir.) cert. denied, --- U.S. ----, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987). As the Senate Report on this act stated, "The purpose of the legislation is to strengthen the capability of the Federal Government to meet the problem of violent interference, for racial or other discriminatory reasons, with a person's free exercise of civil rights." S.Rep. No. 721, 90th Cong., 1st Sess. 3 (1967), reprinted in 1968 U.S.Code Cong. & Admin.News 1837, 1838. Sponsors and opponents of the bill agreed that the protection of the act was very broad. See 114 Cong.Rec. 319 (1968) (statement of Sen. Hart). The sponsors of the bill intended to address a wide range of racially motivated violence and intimidation. See 114 Cong.Rec. 533-36 (1968) (statement of Sen. Javits). This was recognized by opponents of the bill. As Senator Holland stated, "It is very clear to me that when people demonstrate under [Section 245(b)(2)(B) ] ... they are certainly brought under this law." 114 Cong.Rec. 333 (1968) (statement of Sen. Holland).
 
 
 61
 Although many similar statements appear in the legislative history of the act, the district judge in this case ignored Congressional intent. In refusing to examine the legislative history, the district court stated that "[e]ither Webster['s Dictionary] controls and the statutory language leaves no doubt as to its meaning, or there is sufficient ambiguity to trigger the presumption of a construction in favor of the accused." Creekmore, 648 F.Supp. at 1373. Because the district court's approach to this question was flawed and because its holding conflicts with Congressional intent, the granting of the judgment of acquittal constitutes reversible error.
 
 F. Reassignment to Different Judge
 
 62
 As its final contention, the Government argues that these cases should be remanded with instructions that they be assigned to a different district court judge. This is appropriate, the Government claims, because District Judge Acker has demonstrated an inability to disregard his original findings which were reversed by this Court in 1985.
 
 
 63
 This Court has stated that, where a reasonable person would question the trial judge's impartiality, reassignment is appropriate. United States v. Holland, 655 F.2d 44, 47 (5th Cir. Unit B 1981). In addition, cases that have maintained a "stalemated posture" because of the district judge's intransigence require reassignment to another judge. Brooks v. Central Bank of Birmingham, 717 F.2d 1340, 1343 (11th Cir.1983) (per curiam).
 
 
 64
 In cases where there is no proof of personal bias, the Second Circuit has persuasively enumerated factors which should be considered by an appellate court in deciding whether to exercise its supervisory authority to reassign a case. These criteria include:
 
 
 65
 (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.
 
 
 66
 United States v. Robin, 553 F.2d 8, 10 (2d Cir.1977) (en banc ). Although this Court has not explicitly adopted these criteria, we have cited Robin with approval. See United States v. Long, 656 F.2d 1162, 1166 n. 7 (5th Cir. Unit A Sept. 1981). Moreover, other circuits have applied these principles. See, e.g., United States v. Garcia, 694 F.2d 294 (1st Cir.1982); United States v. Sears, Roebuck & Co., 785 F.2d 777 (9th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986).
 
 
 67
 The record in the present cases indicates that Judge Acker has tremendous difficulty putting his 1984 findings out of his mind. Without finding substantially different evidence, Judge Acker held that the SPLC's conduct should be imputed to the Government even though this Court had previously reversed his original finding to that effect. Reassignment will preserve the appearance of justice and, hopefully, it will promote a speedier resolution of these cases. In remanding this case to the Chief Judge for the Northern District of Alabama, we act with the sensitivity "that it is not merely of some importance but is of fundamental importance that justice should not only be done, but should manifestly and undoubtedly be seen to be done." Rex v. Sussex Justices (1924) 1 K.B. 256, 259 (emphasis added). In addition, an unnecessary waste of resources, out of proportion to the benefits involved in preserving the appearance of fairness, will not result.[29] In a similar situation, in which a district court entered a holding that had been explicitly reversed by this Court previously, we held that reassignment was necessary. Brooks, 717 F.2d at 1343. The "stalemated posture" of these cases mandates a similar conclusion here.
 
 
 68
 During the course of this litigation, Judge Acker's position has become hardened against the Government, and he has evidenced a commitment that clearly reflects that he is no longer able to view these cases impartially. We direct that these cases be reassigned.
 
 III. CONCLUSION
 
 69
 The district judge's errors in these cases were numerous. As an initial matter, we reverse the suppression of the SPLC depositions because it violated the law of the case. We also reverse the suppression of Tucker's testimony in State v. Robinson, Kelso's deposition taken in Kelso v. Robinson, and Handley's deposition in Reed v. Handley for the reasons discussed above. In addition, we reverse the district court's dismissal of Kelso's indictment. Moreover, we reverse Judge Acker's grant of Creekmore's motion for a judgment of acquittal because the district court incorrectly interpreted the requirements of Section 245(b)(2)(B). Finally, we remand these cases to the Chief Judge of the Northern District of Alabama for reassignment to a different district judge. On remand, the district judge is directed to conduct further proceedings in these cases not inconsistent with this opinion.
 
 DUMBAULD, Senior District Judge, concurring:
 
 70
 I concur fully in the thorough majority opinion which, inter alia, sustains conviction of defendant Creekmore for violation of 18 U.S.C. 245(b)(2)(B).[1]
 
 
 71
 The indictment in the case at bar charges conspiracy "to intimidate and to interfere with, by force or threat of force, participants in a public parade, because of the race and color of those parade participants and because the participants in the parade were taking part in a privilege and activity, that is a public parade, provided and administered by the City of Decatur, a subdivision of the State of Alabama, which conspiracy resulted in bodily injury to police officers and deputy sheriffs."
 
 
 72
 A hasty and superficial comparison of this charge with the language of the statute[2] might lead one to suppose that the draftsman of the indictment failed to perform his task in an adequate and workmanlike manner.[3]
 
 
 73
 The above-quoted language from the indictment might be interpreted as merely charging interference with participation in a parade "provided" or "administered" by the municipality of Decatur. But it might be difficult to demonstrate that the "parade" involved in the case was "provided" or "administered" by the municipality. And even though a well-drawn indictment could have been laid under the statute invoked, a defendant can not be convicted of an offense different from that which is charged in the indictment under which he is being tried. Stirone v. U.S., 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).
 
 
 74
 However, the above quoted language from the indictment in the case at bar is susceptible of a broader and more inclusive interpretation. Upon examination of the legislative history underlying 18 U.S.C. 245(b)(2)(B), it becomes plain that the language in question should, by necessary implication, be interpreted as if it read:
 
 
 75
 "a public parade, which parade necessarily involved the utilization of streets and the enjoyment of police protection which were provided and administered by the municipality of Decatur."
 
 
 76
 As is fully elaborated in the majority opinion, the sponsors of the parade consulted with the Decatur authorities regarding the route to be followed and the protection to be provided. Indeed, without such involvement it is highly unlikely that the parade could have taken place at all in view of the armed violence anticipated on the part of defendants.
 
 
 77
 The legislative history clearly demonstrates that violent, racially motivated interference with use of the streets in connection with legally protected First Amendment rights to constitutional freedom of speech is punishable under the statutory provision involved in the case at bar. For example, during the course of debate, Senator Ervin (a prominent opponent of the legislation) recognized that "the sidewalks and streets are facilities of the local government."[4] Senator Eastland (another vigorous opponent of the bill) likewise stated: "Certainly, the public streets and sidewalks are facilities provided by a State or subdivision. So are public parks and highways."[5] Police protection is also a service provided by the State or subdivision thereof.
 
 
 78
 Accordingly, since it is obviously impossible for a "parade" under the circumstances existing in the case at bar to take place without use of the streets and police protection, an allegation of violent and racially motivated interference with such a "parade" clearly constitutes an allegation that the defendants interfered with the enjoyment of a service or facility "provided or administered" by a State or subdivision thereof, and therefore constitutes a valid charge of violation of 18 U.S.C. 245(b)(2)(B). Creekmore's conviction must be sustained, and the judgment of the District Court reversed.
 
 
 
 *
 Honorable Edward Dumbauld, Senior U.S. District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Evidence at trial established that defendant Creekmore carried a club in each hand and repeatedly struck the officers
 
 
 [2]
 The named plaintiff in this action was the People's Association of Decatur, a group representing the black marchers. The complaint was later amended to substitute the SCLC as the plaintiff
 
 
 [3]
 Even though Creekmore was named as a defendant in the civil case, he apparently was never served as a defendant
 
 
 [4]
 This meeting may have occurred on July 23rd. The record is unclear on this point
 
 
 [5]
 The ninth defendant was Derane O'Neil Godfrey, who is not a party to this appeal. Godfrey pleaded guilty as part of a plea bargain. United States v. Godfrey, 651 F.Supp. 869, 870 (N.D.Ala.1986)
 
 
 [6]
 Kelso and Creekmore were not deposed in the SPLC civil action brought against the Invisible Empire
 
 
 [7]
 We recognized that obtaining evidence for the criminal prosecution was one of the purposes behind the civil suit, however. Handley II, 763 F.2d at 1405
 
 
 [8]
 Although Dees invited Frohsin to attend the hearing, the record indicates that Frohsin planned to attend in his role as the legal representative of the FBI agent, and we concluded in Handley II that this was Frohsin's reason for attending the hearing. 763 F.2d at 1403
 
 
 [9]
 Tucker testified in 1986 that Dees offered to attempt to persuade the Department to refrain from indicting Tucker if Tucker would cooperate with the SPLC. Id. at 1069. Dees denied this, but the district court believed that Tucker's recollection was correct. Mason, 646 F.Supp. at 848. Although the lower court's credibility determinations must be accepted unless plainly erroneous, United States v. Arends, 776 F.2d 262, 264 (11th Cir.1985), we do not have to reach the credibility issue. Any statements made by Dees are irrelevant in the absence of Government knowledge or participation. Cf. Handley II, 763 F.2d at 1405 (requiring governmental knowledge at the time of the alleged misconduct in order for suppression to be the appropriate remedy)
 
 
 [10]
 The district court quoted part of this colloquy:
 THE COURT: My point, though, and getting back to the discussion of the res judicata; if, for instance, Mr. Handley were convicted in this court of the charges made against him in this court and in the criminal indictment, that would not be res judiciata [sic] on any of the continuing conspiracy items that were added after the burning in Montgomery, would it, in your view?
 [THE WITNESS]: Your Honor, I think the only thing, and I am assuming the facts would all be the same, from what he was convicted of, because he may have been convicted of concealment; may have been convicted of intimidating the witness. I don't know. We charged that --I don't know which one he is convicted of. But assuming he was convicted of exactly the same civil allegation that he conspired to beat up the blacks on the street of Decatur to deprive them of their right--
 THE COURT: When you say, "We charged him", did you charge him of any of those things?
 Mason, 646 F.Supp. at 847 (emphasis supplied by district court). Judge Acker stopped quoting the transcript at this point. However, Dees answered the court's query about whether he had "charged" the defendants with anything, demonstrating clearly that he was referring to the "charges" in the SPLC's civil complaint. The transcript continues:
 THE WITNESS: In the civil complaint, yes, sir.
 THE COURT: You charged him with intimidating witnesses?
 THE WITNESS: No, sir, no, sir, no. I am saying only the things that we made a charge in the civil complaint of, and those charges weren't in the civil complaint, I don't believe.
 R17-184.
 
 
 [11]
 The district court stated that the new evidence emphasized above gave "new meaning" to a letter written by Dees to Frohsin on June 7, 1983. Mason, 646 F.Supp. at 848. Dees wrote, "You mentioned that one of the problems you might have with our witnesses who we have agreed not to pursue as [defendants] in exchange for their testimony is the bias a jury might attribute to their statement." Handley I, 591 F.Supp. at 1263. This letter was discussed by the district court at the first suppression hearing and Judge Acker stated that the use of the past tense "mentioned" indicated that Dees and Frohsin had discussed the Government's case prior to the July 27th meeting at which Dees gave the Department some deposition excerpts. However, this Court did not deem this letter significant in Handley II, and the district court's attempt to rely on it at the second suppression hearing clearly violates the law of the case
 Similarly, at the first suppression hearing, the district court concluded that the Department and Dees were exchanging information. As evidence of this, the court pointed to a Washington, D.C. meeting between Dees and Rinzel which occurred in August 1983. Dees testified that this was a "chance meeting" at which he and Rinzel discussed the burning of the SPLC's office in Montgomery, AL. In Handley II, this Court did not find that this meeting was evidence of illicit cooperation between the Department and Dees. Accordingly, the district court's attempt to rely on the same evidence concerning the August meeting is precluded by the law of the case.
 
 
 [12]
 In addition to the evidence discussed above, the district court cited other evidence which allegedly indicated that Dees' sole purpose was to pursue a criminal investigation. However, none of this evidence is "substantially different" from what was before this Court in 1985. Our holding in Handley II that the SPLC civil action is "viable wholly apart from any criminal connotations," 763 F.2d at 1405-06, remains correct. The SPLC has obtained consent decrees against 31 of the 55 civil defendants, thereby indicating that the civil action has independent vitality. Moreover, the SPLC has continued to pursue the civil defendants despite the criminal indictments. Thus, the district court's finding regarding the SPLC's sole purpose was error
 
 
 [13]
 Neither White nor Mason moved for suppression of the depositions in 1984; therefore, they argue that the law of the case does not apply to them. Assuming arguendo that this is correct, suppression of their depositions was still error because there was no coercion in taking the deposition. Judge Haltom's discovery order did not apply to White when he was deposed because he was not a party to the civil suit at that time. In addition, White did not know about the discovery order, White, 643 F.Supp. at 1071; therefore, he could not have been coerced by it. Because White was not compelled to testify over his claim of the Fifth Amendment privilege, the deposition is not involuntary
 
 
 [14]
 The district court held that because Mason's deposition was taken August 15, 1983, after the July 27, 1983 meeting at which Dees gave the Department some deposition excerpts, Dees' conduct during Mason's deposition could be imputed to the Government. However, there was no coercion in Mason's deposition. Like White, Mason was not a party in the SPLC civil action when he was deposed, and Judge Haltom's discovery order did not apply to him. Mason, 646 F.Supp. at 850. More importantly, Mason did not invoke his Fifth Amendment privilege at his deposition. Because he was not compelled to answer any questions over his claim of the Fifth Amendment, he waived any Fifth Amendment rights he may have had. As there was no compulsion in this deposition, there is no improper behavior to impute to the Government
 
 
 [15]
 United States v. Mekjian, 505 F.2d 1320, 1328 (5th Cir.1975), does not require a contrary result. Mekjian addressed the question of when a private party's search for evidence can be attributed to the government for Fourth Amendment purposes. In Mekjian, the predecessor to this Court held that, absent actual or implicit governmental knowledge that a private party would continue to provide documents to the government, and absent encouragement or cooperation by the government, the evidence was admissible. In the present cases, the Government did not encourage the SPLC to take depositions and turn them over to the Government, nor did it cooperate by providing the SPLC with any information about the criminal investigation. Therefore, the SPLC conduct, even if coercive, could not be attributed to the Government. More importantly, as will be discussed infra, any defendant who failed to assert his Fifth Amendment rights, waived the privilege
 
 
 [16]
 A boilerplate paragraph in each SPLC deposition stated:
 IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial or at the time said deposition is offered in evidence, or prior thereto.
 See, e.g., Handley III, 644 F.Supp. at 1186.
 
 
 [17]
 The district court's reliance on Jordan v. Medley, 711 F.2d 211, 217 (D.C.Cir.1983), is misplaced because Jordan merely allowed an evidentiary objection to testimony concerning a prior arrest even though no objection was made during the deposition. Jordan did not involve a failure to assert a Fifth Amendment privilege
 
 
 [18]
 In the court below and in its brief, the Government stated that it did not intend to use any deposition testimony of Tucker or Riccio identifying themselves in pictures of the Decatur incident which was elicited after they had asserted a Fifth Amendment privilege and were told to answer pursuant to Judge Haltom's order. Nor does the Government intend to use photographic identifications made by Steele. Because of our holding that the district court violated the law of the case, we do not address the significance of the Government's decision not to attempt to use the identifications
 
 
 [19]
 Tucker testified that, when he received the subpoena, he called Dees and asked if he would need an attorney. Tucker stated that Dees responded in the negative. On the basis of this testimony, the district court found that Dees misled Tucker into believing that "he had nothing to worry about." Handley, 644 F.Supp. at 1190. Even if this interaction between Dees and Tucker occurred, which Dees disputed, it does not demonstrate that Tucker's trial testimony was involuntary
 
 
 [20]
 The district court also suppressed Tucker's testimony on the ground that the Government obtained it as the "fruit" of the involuntary SPLC deposition. Handley III, 644 F.Supp. at 1200. However, we have already held that the SPLC deposition was not involuntary
 
 
 [21]
 In Euceda-Hernandez, this Court refused to allow suppression solely as a prophylactic measure. 768 F.2d at 1312-13. However, the Court noted that it had accepted this justification for suppression in United States v. Campagnuolo, 592 F.2d 852 (5th Cir.1979). The Court stated that Campagnuolo was different from Euceda-Hernandez because the former case involved an egregious violation of Rule 16 which the Euceda-Hernandez court implied was intentional. 768 F.2d at 1313. The Government's violation in this case was not egregious. Although the Government should have disclosed the testimony to Tucker much earlier, the defendant should have been aware of this testimony, and there is no indication that the Government intentionally withheld it or that a continuance would not have alleviated any prejudice. See Burkhalter, 735 F.2d at 1329. Under these circumstances, Euceda-Hernandez and Burkhalter control the disposition of this question
 
 
 [22]
 In its brief and at the district court, the Government said that it believed that it had produced Kelso's deposition along with the 136 depositions it had turned over to the defendants in 1984. Appellant's Brief at 73
 
 
 [23]
 As a general rule, a district court is divested of jurisdiction over any matters appealed as soon as the notice of appeal is filed. Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982) (per curiam); United States v. Rogers, 788 F.2d 1472, 1475 (11th Cir.1986). Nonetheless, the district court properly concluded that it had jurisdiction to consider a motion to dismiss the indictment, despite the pending interlocutory appeal before this Court. United States v. Spears, 827 F.2d 705, 708 n. 1 (11th Cir.1987); United States v. Gatto, 763 F.2d 1040, 1050 (9th Cir.1985)
 
 
 [24]
 On November 14, 1985, the district court stated that all the defendants' motions would "henceforward" be considered joint. R2-67-2. However, this order appeared more than one year after the other defendants had made the motion requesting the names of the unindicted co-conspirators. Since the district court's statement that the motions would be considered joint did not apply retroactively, Kelso cannot benefit from the other defendants' motion
 
 
 [25]
 Even if the Government had such an obligation, it disputes the district court's finding that the United States had not revealed Smith's involvement to Kelso. The Government claims, and the defendants do not dispute, that it provided each defense attorney, including Kelso's, with a copy of Smith's SPLC deposition and an FBI interview with Smith. Appellant's Brief at 82. Thus, Smith's activities were revealed to Kelso even if Smith was not specifically identified as an unindicted co-conspirator
 
 
 [26]
 This statute provides:
 (b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with or attempts to injure, intimidate or interfere with--
 (2) any person because of his race, color, religion or national origin and because he is or has been--
 (B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any state or subdivision thereof [shall be guilty of a crime].
 
 
 [27]
 Argument in this Court and in the court below focused on whether the parade was administered by the city. The Government did not actively pursue the question whether the city "provided" the parade. Thus, we do not address this issue. However, we note that the city provided the streets on which the demonstrators marched, and it provided the police protection to which the demonstrators and the general public were entitled
 
 
 [28]
 The district court also stated that, because this was a criminal statute, it must be strictly construed. Id. at 1373 (citing United States v. Enmons, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973)). However, a court's construction of a statute cannot ignore Congressional intent. See infra
 
 
 [29]
 There will not be unnecessary duplication at the district court because five of these cases have yet to be tried, and the sixth case (Creekmore ) is being remanded for the judge to enter judgment pursuant to the jury's guilty verdict
 
 
 [1]
 This provision prohibits interference, by force or threat of force, because of race, with any person who is "participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."
 
 
 [2]
 See note 1, supra
 
 
 [3]
 As in U.S. v. Price, 383 U.S. 787, 791, 86 S.Ct. 1152, 1155, 16 L.Ed.2d 267 (1966), "the question before us is whether the attempt of the draftsman for the Grand Jury ... has been successful: whether the indictments charge offenses against the various defendants which may be prosecuted under the designated federal statutes."
 
 
 [4]
 Congressional Record, Vol. 114, p. 333 (January 18, 1968)
 
 
 [5]
 Ibid., p. 1029 (January 25, 1968)