UNITED STATES of America

v.

Sam HAYES, Jeffrey Lynn Howard, Herman Lee Curry, and Haskell Watson, Jr.

Crim. A. No. 88–AR–136–S.

United States District Court, N.D. Alabama, S.D.

Jan. 11, 1989.

Frank W. Donaldson, U.S. Atty., John Earnest, Jr., Asst. U.S. Atty., Birmingham, Ala., for U.S.

J. Harry Blalock, Birmingham, Ala., for defendant Sam Hayes.

Tommy Nail, Birmingham, Ala., for defendant Jeffry Lynn Howard.

Russell T. McDonald, Birmingham, Ala., for defendant Herman Lee Curry.

Joel Alexander, Birmingham, Ala., for defendant Haskell Watson, Jr.

## MEMORANDUM OPINION

ACKER, District Judge.

This judge has never written an opinion using the personal pronoun. I have always used the traditionally formal and somewhat stilted language, "this court," to describe myself. This case, however, peculiarly lends itself to a deviation from this norm. The personal pronoun will therefore be used hereinafter in order to avoid any possible implication that what I am saying represents the thinking of the entire bench of the United States District Court for the Northern District of Alabama. Some of its judges may agree. Others may not.

In the above-entitled criminal case, there has arisen an issue that pervades the sentencing consideration as to four defendants: Sam Hayes, Jeffrey Lynn Howard, Herman Lee Curry, and Haskell Watson, Jr. I would have imposed upon each of these defendants a lesser custodial sentence than I did but for my conclusion that the *minimum* allowable sentence as to each defendant is ten (10) years. Their sentencing hearings were held on January 5, 1989, a considerable period of time after their adjudications of guilt. This time allowed counsel a reasonable opportunity to research the subject about which I now speak. Although the individual sentencing orders were actually signed on January 6, 1989, and some notices of appeal may have already been filed, I expressly reserved the right to write an opinion because of the complexity and the importance of the issue, not just in this case, but also in others like it.

### The Background

On November 28, 1988, pursuant to a plea bargain, Hayes entered a plea of guilty to Count One of the indictment, which originally named eight defendants and contained twenty counts. Only five counts charged Hayes with any criminal violation. In exchange for Hayes' guilty plea to Count One, the government dismissed the other four counts against him and recommended a custodial sentence not to exceed four (4) years, although the maximum penalty for the crime charged in Count One is life imprisonment and a fine of $4,000,000.00. The government pointed to Hayes' extensive cooperation after his arrest as the mitigating factor leading to its recommendation of a lenient sentence.

During the lengthy colloquy which preceded my acceptance of Hayes' plea and

my adjudication of his guilt under Count One, I made it crystal clear to Hayes that I think Count One, in all probability, carries a *minimum* sentence of ten (10) years, perhaps even to be followed by a mandatory term of supervised release of not less than five (5) years. This colloquy was occasioned by the fact that I had just acquired the information that effective November 18, 1988, a "technical" amendment to the criminal statute under which Hayes was being sentenced required a new look at its meaning. This new amendment, Public Law 100–690, was passed by both the House of Representatives and the Senate on October 21, 1988, and was signed into the law by the President on November 18, 1988. The United States Attorney and Hayes were unfamiliar with this fact and with the content of the amendment and with its legislative history until I brought it all to their attention during the plea litany. After accepting the plea, I delayed the imposition of sentence, both in order to study Hayes' pre-sentence report and in order to give Hayes' counsel and the United States Attorney time within which to respond further to the serious question of statutory construction which I had detected from a reading of the legislative reports. I raised the question *sua sponte.*

On December 10, 1988, Howard, Curry and Watson all were found guilty by a jury of the charges made against them in the same Count One as to which Hayes had already confessed guilt. These three were also set for sentencing on January 5, 1989.

After December 10, 1988, further study has confirmed my earlier, orally expressed, tentative opinion. Because I have invited and expect appeals to the Eleventh Circuit by Hayes, Howard, Curry and Watson from their sentences insofar as their sentences reflect my firm belief that Congress mandated a minimum custody period of ten (10) years, it is appropriate that I articulate my reasons for arriving at that belief.

Hayes entered his guilty plea pursuant to Rule 11(a)(2), F.R.Cr.P., with my permission, upon the express condition that he be allowed to appeal from any sentence in excess of the four (4) years recommended by the government.

### Preliminary Points

I wish to make several preliminary points. First, the four sentences which I imposed on January 6, 1989, were not imposed with any reference to, or any reliance upon, the Sentencing Guidelines. The consensus opinion of the judges of the United States District Court for the Northern District of Alabama is that the Guidelines are unconstitutional. *United States v. Allen,* 685 F.Supp. 827 (N.D.Ala.1988). We await the decision of the Supreme Court. Second, as to Hayes, nothing in his pre-sentence report or any feeling I have about the level of his participation, or his degree of culpability, would have led me to exceed the government's recommendation of four (4) years. I imposed the ten (10) year sentence on Hayes, and, for that matter, on the other three convicted by the jury, only because I am controlled by overriding statutory constraints. Third, there are admittedly certain elements in this situation which can validly be described as unfair, particularly when equality of punishment was one reason for the creation of the Sentencing Commission and for its promulgation of the Sentencing Guidelines, whether constitutional or not. Another defendant in this case, Harold Singleton, also pled guilty to Count One under an earlier plea bargain, pursuant to which he actually testified against his alleged co-conspirators. On October 26, 1988 (*before the recent legislative alert*), Singleton was sentenced by Chief Judge Sam C. Pointer, Jr., of this court exactly in accordance with the government's recommendation of a six (6) year custodial term, four (4) years less than what I now find to be the statutory minimum. Singleton's previous criminal history is far more extensive and more offensive to society than any of the criminal records of the four defendants I have sentenced under the same Count One. While Singleton was being sentenced by Judge Pointer, there was no discussion or consideration of the possibility of a statutory construction which would require a minimum sentence of ten (10) years or of a following five (5)

year period of supervised release, undoubtedly because there was nothing to bring the potential problem to Judge Pointer's attention. While the disparate treatment of Singleton and my four defendants contains a dimension which may seem unfair, such "unfairness," if it exists, does not release me, and cannot deter me, from imposing on my four defendants what I find to be the minimum sentence mandated by Congress. Admittedly, the situation is bothersome, because I have a conscience, but the judicial prognosis was fully explained to Hayes before his guilty plea was accepted, and Hayes proceeded nevertheless to tender his guilty plea with the full appreciation that, in all probability, his only escape from ten (10) years in jail would be a turning of the key by the Eleventh Circuit or by the Supreme Court, if one or both of these appellate courts should disagree with me.

### The Legal Analysis

Count One invoked 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), and (b)(1)(A)(ii)(II). It charged all eight defendants with *conspiring* to distribute five (5) kilograms of cocaine. The drug *conspiracy* statute, § 846, as it appeared in the United States Code when these defendants did whatever they did, provided:

#### Attempt and conspiracy

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

The *substantive* drug offense statute here invoked, § 841, provides, in pertinent part:

#### Prohibited acts A

(a) ... it shall be unlawful for any person knowingly or intentionally—

(1) to ... distribute, or dispense, or possess with intent to ... distribute, or dispense, a controlled substance....

\*　　\*　　\*　　\*　　\*　　\*

(b) Penalties

... any person who violates subsection (a) of this section shall be sentenced as follows:

(1)(A) In the case of violation of subsection (a) of this section involving—

\*　　\*　　\*　　\*　　\*　　\*

(ii) 5 kilograms or more of a mixture or substance containing a detectable amount of—

\*　　\*　　\*　　\*　　\*　　\*

(II) cocaine, its salts, optical and geometric isomers and salts of isomers.

\*　　\*　　\*　　\*　　\*　　\*

such person shall be sentenced to a term of imprisonment *which may not be less than 10 years* or more than life ... or $4,000,000 if the defendant is an individual....

\*　　\*　　\*　　\*　　\*　　\*

Any sentence under this subparagraph shall ... impose a term of supervised release of at least 5 years in addition to such term of imprisonment....

(emphasis supplied).

It has been judicially determined in this case that these defendants did, in fact, *conspire* to distribute five (5) kilograms of cocaine in violation of § 846. If they had been found guilty of actually *distributing*, or possessing with intent to *distribute*, the same five (5) kilograms of cocaine, a custodial sentence of not less than ten (10) years would clearly be unavoidable under § 841(a)(1), (b)(1)(A)(ii)(II). I have no way of knowing precisely how or why the government reached the conclusion it apparently reached before undertaking its negotiations with Hayes and Singleton, namely, that the minimum custodial sentence under § 841 does not apply to a violation of § 846. I speculate that the government is fond of the bargaining freedom that a lesser penalty for *conspiracy* gives it in negotiating with a potentially cooperative drug co-conspirator. It would have been a misrepresentation by the government for it to recommend to me four (4) years if it believed the minimum to be ten (10) years.

Therefore, I necessarily assume that the government honestly disagreed with my analysis even before it finally researched the question and expressed its official disagreement with me on January 5, 1989.

These four defendants and the government now join in contending that Congress intended to provide a minimum ten (10) year sentence and a term of supervised release for the crime of *distributing* five (5) kilograms of cocaine but did *not* intend for the crime of *conspiring* to do the same thing to carry these same minimum penalties. The question here presented is, then, a pure but not so simple question of statutory construction.

I will undertake to apply the various tools of statutory construction to § 846 in order to ascertain the meaning and intent of Congress as of the dates of this conspiracy. The first of these helpful rules of construction is that related statutes, as §§ 846 and 841 certainly are, must be construed *in pari materia.* Both §§ 846 and 841, originally enacted as part of The Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, were parts of the same legislative package. They must be construed together and must be made to harmonize to the extent possible. The original 1970 bill represented a clear Congressional recognition of, and a response to, the seriousness of the drug problem in the United States. It was a tough reaction to a tough problem. The 1970 legislative history contained the following expression:

> *Criminal Penalties*—The bill revises the entire structure of criminal penalties involving controlled drugs by providing *a consistent method of treatment of all persons accused of violations.* With one exception involving continuing criminal enterprises, hereafter discussed, *all mandatory minimum sentences are eliminated.*

H.R.Rep. No. 1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4566, 4570 (emphasis supplied). Congress clearly intended to be "consistent," an admittedly not unusual legislative hope. Congress started in 1970 with the elimination of all minimum sentences except for the so-called "king pin" statute. However, in subsequent amendments to § 841 Congress began to reintroduce minimum criminal sentences for certain levels of distribution involvement. While § 841 was thus being incrementally changed between 1970 and 1984, § 846 was left alone to read just as it had read from its original enactment in 1970 until its recent "technical" amendment, effective November 18, 1988. Thus, between 1970 and the dates of the conspiracy described in this indictment, § 841 was amended several times to make it read as above quoted. Fortunately or unfortunately, as the Congress reintroduced express minimum sentences for certain substantive drug offenses, it did not see any need to amend § 846, the conspiracy statute, and did not do so until November 18, 1988, when it was amended by Public Law 100–690, to strike from § 846 the words "is punishable" and all of the words that follow through the word "punishment" and to insert in their stead the words "shall be subject to the same penalties as those." This means that as of January 5, 1989, § 846 read as follows:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

The problem inhering in § 846 finally surfaced in *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), a case that involved the question of whether or not a person convicted of conspiracy to violate a substantive drug provision of The Comprehensive Drug Abuse Prevention and Control Act of 1970, which said substantive violation admittedly carried a mandatory special parole term following incarceration, could be sentenced to such a trailing special parole term. In *Bifulco,* the majority dwelled upon the concededly important rule of construction applicable to any criminal statute, i.e., the "rule of lenity," or the rule of strict construction in favor of the accused. Chief Justice Burger concurred specially, eloquently advocating a limited judicial role

that requires the courts to take Congress "at its word unless we are to assume the role of statute revisers." 100 S.Ct. at 2259. The Chief Justice pointedly and impeccably said:

> If the question presented by this case were as simple and easy as the dissent formulates it—whether "the directors of a narcotics distribution business [should] be punished less severely than their subordinates who merely peddle the poison" —none of us would have any difficulty with the decision. But that is not really the issue. Rather, the question before the Court is substantially more limited: What do the words of the statute mean? Of course, we must try to discern the intent of Congress. But we perform that task by beginning with the ordinary meaning of the language of the statute. Our compass is not to read a statute to reach what we perceive—or even what we think a reasonable person should perceive—is a "sensible result"; Congress must be taken at its word unless we are to assume the role of statute revisers. *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980); *TVA v. Hill*, 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978).
>
> Particularly in the administration of criminal justice, a badly drawn statute places strains on judges. See, e.g., *Busic v. United States*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980); *LaRocca v. United States* (decided with *Busic*). The temptation to exceed our limited judicial role and do what we regard as the more sensible thing is great, but it takes us on a slippery slope. Our duty, to paraphrase Mr. Justice Holmes in a conversation with Judge Learned Hand, is not to do justice but to apply the law and hope that justice is done. The Spirit of Liberty: Papers and Addresses of Learned Hand 306-307 (Dilliard ed. 1960).

100 S.Ct. at 2259-60.

Chief Justice Burger was attempting to refute the *Bifulco* dissenters, constituting a substantial and vocal minority consisting of Justices Stevens, White and Rehnquist, speaking through Justice Stevens, who said, just as eloquently, in dissent:

> Should the directors of a narcotics distribution business be punished less severely than their subordinates who merely peddle the poison? It is unlikely that Congress has so intended. *See Callanan v. United States*, 364 U.S. 587, 593-594, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 [ (1961) ].
>
> Since an ordinary reading of § 406 [1] of the Comprehensive Drug Abuse Prevention and Control Act of 1970 implies that a conspirator may be punished just as severely as a substantive offender, I would so construe the statute. This construction is fortified by the total absence of any statement by any legislator suggesting any purpose to treat conspirators in the drug trade with any greater lenity than substantive offenders.[2] This is particularly important in view of the fact that prior to the 1970 Act, Congress had authorized identical penalties for conspiracies and completed offenses. See *ante* 100 S.Ct. at 2254.
>
> Because the statutory language conveys quite a different meaning to me, and because the Court has not paused to consider the narrow issue presented by this case in the context of the larger objectives Congress was seeking, I respectfully dissent.

---

1. "Any person who attempts or conspires to commit any offense defined in this title is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 84 Stat. 1265, 21 U.S.C. § 846.

2. Surely the Court's reference *ante,* at 2258, to the offense of attempt cuts the other way, for it is common for legislation to authorize the same range of punishments for attempts as for substantive offenses. See, *e.g.,* American Law Institute, Model Penal Code § 5.05(1) (Prop. Off. Draft 1962), which provides in part: "Except as otherwise provided in this Section, attempt, solicitation and conspiracy are crimes of the same grade and degree as the most serious offense which is attempted or solicited or is an object of the conspiracy."

100 S.Ct. at 2260.

The object of both the majority and of the minority of the Supreme Court in *Bifulco* was to ascertain Congressional intent.

This was also the object of the Eleventh Circuit in *United States v. White*, 846 F.2d 678, 695 (11th Cir.1988), in which the Eleventh Circuit recently brushed aside Chief Justice Burger's "rule of lenity" and, without saying so, went strongly with the reasoning of the *Bifulco* minority. There the Eleventh Circuit was construing 18 U.S.C. § 245(b), another criminal statute which I, as the district court, had construed strictly. The Eleventh Circuit used the following language:

> "Racially motivated violence during parades, marches, and demonstrations was precisely what this Act was designed to redress." [*U.S. v.*] *Griffin*, 585 F.Supp. [1439] at 1446 [ (M.D.N.C.1983) ]. *The statute must be construed to achieve its broad remedial purpose. United States v. Gilbert*, 813 F.2d 1523, 1527 (9th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987). As the Senate Report on this Act stated, "*The purpose of the legislation is to strengthen the capability of the federal government to meet the problem of violent interference, for racial or other discriminatory reasons, with a person's free exercise of civil rights.*" S.Rep. No. 721, 90th Cong., 1st Sess. 3 (1967), *reprinted in* 1968 U.S.Code Cong. & Admin.News 1837, 1838. Sponsors and opponents of the bill agreed that the protection of the act was very broad. *See* 114 Cong.Rec. 319 (1968) (statement of Sen. Hart). The sponsors of the bill intended to address a wide range of racially motivated violence and intimidation. *See* 114 Cong.Rec. 533–36 (1968) (statement of Sen. Javits). This was recognized by opponents of the bill. As Senator Holland stated, "It is very clear to me that when people demonstrate under [Section 245(b)(2)(B) ] ... they are certainly brought under this law." 114 Cong.Rec. 333 (1968) (statement of Sen. Holland).
>
> Although many similar statements appear in the legislative history of the act, the district judge in this case ignored Congressional intent. In refusing to examine the legislative history, the district court stated that "[e]ither Webster['s Dictionary] controls and the statutory language leaves no doubt as to its meaning, or there is sufficient ambiguity to trigger the presumption of a construction in favor of the accused." [*U.S. v.*] *Creekmore*, 648 F.Supp. [1369] at 1373 [ (N.D.Ala.1986) ]. Because the district court's approach to this question was flawed and because its holding conflicts with Congressional intent, the granting of the judgment of acquittal constitutes reversible error.

846 F.2d at 695 (emphasis supplied).

It is just as easy to discern the "broad remedial purpose" of The Comprehensive Drug Abuse Prevention and Control Act of 1970 as it is to discern the "broad remedial purpose" of 18 U.S.C. § 245(b). I can certainly agree with the Eleventh Circuit's conclusion as to what constituted the "broad remedial purpose" of 18 U.S.C. § 245(b). To ascertain the "broad remedial purpose" of § 846 was easy for Justices Stevens, White and Rehnquist.

This 1988 Eleventh Circuit adherence to the "broad remedial purpose" rule as paramount for construing and ascertaining the meaning of a criminal statute, came eight years after *Bifulco*. *United States v. White* would be binding on me even if I were not the district judge who was not only reversed in that case but who was found to be "intransigent" for failing to follow the Eleventh Circuit's clear earlier directions. A smart dog, even if not owned by Pavlov, is reluctant to step across the log where he got snakebit yesterday. On the issue of how to construe a criminal statute, this dog was bitten by a snake in *White* and has thereafter publicly acknowledged that the Eleventh Circuit is composed of reasonable people. *See In re Possible Recusal of William M. Acker, Jr. in Government's Cases*, 696 F.Supp. 591 (N.D.Ala.1988). I do not plan to step across that same log today. I'd rather be bitten by the Supreme Court if I have to suffer another bite.

To illustrate the problem district judges have when we perceive jurisprudential conflicts between our own Court of Appeals and the Supreme Court, I refer to *Whitt v. Goodyear Tire & Rubber Co.*, 676 F.Supp.

1119 (N.D.Ala.1987), wherein I followed the Eleventh Circuit's *Chilton v. Savannah Foods & Indus., Inc.*, 814 F.2d 620 (11th Cir.1987), when my heart and mind told me to take the Supreme Court at its word in *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987).

### Some Things to Think About Besides Snakes

I might feel more frustrated and whipsawed between the Eleventh Circuit's 1988 *White* and the Supreme Court's 1980 *Bifulco* were it not for a few additional factors which, in my view, militate toward a construction of § 846 after November 18, 1988, to require the imposition of the ten-year minimum period of incarceration for these four defendants.

*First Factor:*

*Bifulco's* facts are clearly distinguishable from the facts of this case. *Bifulco* dealt specifically with the *special parole term* mandated for a substantive drug violation, as it related to a conspiracy to do the same thing. Before the November 18, 1988, technical amendment, § 846 expressly limited the punishment for conspiracy to "*imprisonment* or fine or both, which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy." (emphasis supplied). It nowhere mentioned "parole" or "supervised release." In other words, in *Bifulco* the Supreme Court *was not called upon* to interpret § 846 *in pari materia* with a substantive offense statute insofar as it might provide a *minimum* period of *imprisonment*. When § 846 says that the sentence may not exceed the maximum period of *imprisonment*, it was arguably very wise for the Supreme Court under the "rule of lenity" or any other rule of fair play to conclude that a special parole term, *which most assuredly does not constitute "imprisonment,"* cannot be tacked onto a conspirator's actual *prison term*. It would, however, be taking the "rule of lenity" a considerable stride beyond *Bifulco* to say that the *maximum* term of *imprisonment* does not automatically and in-ferentially incorporate and adopt the *minimum* term of *imprisonment*. The logic of the *Bifulco* majority's grammar is unassailable. The same logic, however, does not apply to § 846's minimum term of *imprisonment*. "Imprisonment" is "imprisonment," whether for ten (10) years or for life. In my opinion, the outcome in *Bifulco* would have been different if the issue there had been the applicability of the mandatory minimum *prison term* instead of the mandatory minimum *special parole term*.

*Second Factor:*

When *Bifulco* was decided in 1980, the majority relied largely on what it found to be a dearth of legislative history, which, if it had existed, might have indicated a Congressional intent to require the courts to impose the same penalties upon a *conspirator* as to a person *committing the drug offense itself*. Without such a legislative history, the *Bifulco* majority was left with no way around the rule of a literal construction in favor of the person criminally accused. But, what was true in 1980 as to an absence of extra-statutory expressions of 1970 Congressional intent *is not true today*. There *now is* a legislative history for § 846 reflecting intent as of 1970, even if that history was written too late for the *Bifulco* court to have it available. When the drug enforcement amendments contained in Public Law 98–473 were under consideration in 1984, four years after *Bifulco*, the official legislative history reflects:

### Present Federal Law

Offenses involving domestic trafficking in controlled substances are governed by 21 U.S.C. 841. Subsection (a) of section 841 punishes those who knowingly or intentionally (1) manufacture, distribute, distribute or dispense, or possess with intent to manufacture, distribute, distribute or dispense, a controlled substance; or (2) create, distribute, dispense, or possess with intent to distribute or dispense, a counterfeit substance.[4] The penalties for these offenses are set out in subsection (b) of section 841, and include terms of imprisonment, fines, and special parole terms.[5] The maximum penalties

are doubled if the offender has previously been convicted of a Federal drug offense. *In the case of an attempt or conspiracy to commit one of the offenses described in 21 U.S.C. 841(a), the penalty is to be the same as for the offense which was the object of the attempt or conspiracy.*[6]

4. A "counterfeit substance" is a controlled substance which, or the container or labeling of which, bears false or misleading information about the true manufacturer, dispenser, or distributor. See 21 U.S.C. 802(7).

5. No special parole term is prescribed for an offense involving a Schedule V controlled substance.

6. See 21 U.S.C. 846.

Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, 1984(4) U.S.Code Cong. & Admin.News (98 Stat.) 3182, 3438 (emphasis supplied).

In 1984, then, Congress was clearly asserting that *"present federal law"* (*as of 1970*) required the same minimum and maximum *penalties* for violations of § 846 and violations of § 841. In 1984 Congress did not even take passing mention of *Bifulco*. This leaves little doubt but that Congress in 1970 had no actual intention whatsoever of making any distinction between the *penalty* to be imposed for a conspiracy and the *penalty* to be imposed for the target offense. Four years after *Bifulco*, Congress was saying simply and straightforwardly that its original intent in § 846 was, and always had been, to require the same *minimum* penalty for a violation of § 846 as for a violation of § 841.

"History," including legislative history, is not limited to accounts authored contemporaneously with the occurrence of the historical event. The "after-the-fact" recollections of an eyewitness are surely more accurate and revealing of the truth about an historical event than a failure to find any report about the event in the newspapers published the day of the event.

*Third Factor:*

Not only has Congress now supplied its original intent, but effective upon the President's signature on November 18, 1988, § 846 received a *clarifying amendment.* Congress in the Congressional Record of June, 1988 acknowledged for the first time the existence of *Bifulco,* much less its possible significance or effect. 134 Cong.Rec. S7448 (daily ed. June 8, 1988). Nevertheless, the Record nowhere contains any concession by Congress that its true intent in § 846 has ever changed, or that the *Bifulco* majority correctly read the intent of Congress. This very recent legislative history leading up to the adoption of what the Senate styled "The Minor and Technical Criminal Law Amendments Act of 1988," says:

> Section 148(a) amends 21 U.S.C. 846 and 963 to assure that all the penalties applicable to an underlying drug offense also apply to an attempt or conspiracy to commit the offense. *Current law* provides that the penalty for such attempts and conspiracies "may not exceed the maximum punishment" prescribed for the underlying offense. See Title 21, United States Code, Sections 846 and 963. *This would seem to indicate that any punishment imposable for a substantive drug violation would be impossible for an attempt or conspiracy to commit the same offense.*

The substantive drug offenses, however, carry a number of unusual penalty provisions. Section 841(b)(1)(B) of title 21, for example, provides for a mandatory minimum penalty of 5 years, and provides that in addition to any term of imprisonment, the court shall impose a term of supervised release of at least 4 years. The conspiracy statutes make no reference to these special penalties, and it is *not clear* whether the "may not exceed" language permits their imposition. Indeed, the Supreme Court has held that where a conspiracy statute fails to make explicit reference to "novel" penalty provisions in an underlying substantive offense, those penalties *may not* be imposed for conspiracy violations. *Bifulco v. United States,* 447 U.S. 381 [100 S.Ct. 2247, 65 L.Ed.2d 205] (1980) (special parole term authorized for substantive drug offense not imposable for violation of Sec. 846 conspiracy).

In *Bifulco* the Court stated that if Congress intended the penalties for at-

tempt and conspiracy violations to include all of the special penalties imposable for the underlying offenses, it had "a simple remedy—the insertion of a brief appropriate phrase" in the conspiracy statutes. *Id.* [447 U.S.] at 401 [100 S.Ct. at 2259]. The amendment in section 148(a) of the draft bill would do exactly that. By striking the "may not exceed" language and replacing it with the phrase "shall be subject to the same penalties," *Congress would make clear that any penalty that may be imposed for a substantive drug offense may be imposed for an attempt or conspiracy to commit that offense.*

*Id.* at 7446, 7448 (emphasis supplied).

Thus, as Congress finally adopted its technical amendment to § 846 in 1988, it was still insisting that its only mistake, if it made a mistake in 1970, was in not being entirely *clear* in its choice of words.

■ I agree with these four defendants that if the amendment, which became effective on November 18, 1988, accomplished a *substantive change* in the law, mandating for the first time a minimum period of incarceration for a violation of § 846, and that there was no Congressional intention to impose a minimum period of incarceration prior to November 18, 1988, then the application on January 6, 1989, of the November 18, 1988, amendment to these defendants would violate the constitutional prohibition against *ex post facto* laws. *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). The *ex post facto* principle applies to any activity in which a person engages with a reason to believe that it does not give rise to a particular penalty. This additional protection comes not from the *ex post facto* constitutional prohibition itself but from the "due process" clause of the Fifth Amendment, which incorporates the same concept for judicial interpretations and holds that they arise to the level of a guaranty. *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Here, however, while these defendants might, by reading *Bifulco*, have had reason to believe that if they were to conspire to distribute 5 kilos,

they were exempted under § 846 from a special parole term, there was no rational reason for them to conclude that they were also exempted from a *minimum custodial sentence* under § 846. Why? People are presumed to know the available law, but there were no published opinions on the specific subject here under discussion when this conspiracy began, or when it ended. There still are none.

I have never contemplated applying the new 1988 amendment retroactively. I only undertake to decide the significance of the recent amendment as a tool of statutory construction. The question is whether Congress adopted a new penal concept in 1988, or simply explained and clarified the pre-existing Congressional intent of § 846 in fear that the courts may have failed properly to grasp that intent.

The controlling principle of statutory construction here at play is articulated as follows in Sutherland's *Statutory Construction*, dealing with the significance of *amendatory* acts:

Although a presumption of change in legal rights is probably reasonable in that an amendment is more frequently used to add or take a provision from a law than to interpret it, the fact of amendment by itself does not indicate whether the change is of substance of form—whether a right is added to or taken from the original act, or whether a provision in the original act is merely being interpreted, that is, made more detailed and specific. *To determine this the circumstances surrounding the enactment must be looked into. If they indicate that the legislature intended to interpret the original act, the presumption is rebutted. An amendment of an unambiguous statute indicates a purpose to change the law, whereas no such purpose is indicated by the mere fact of an amendment of an ambiguous provision.*

1A Sands, *Sutherland Stat. Const.* § 22.30, at 266 (4th ed. 1985) (footnotes omitted) (emphasis supplied).

The same proposition appears in Corpus Juris Secundum, as follows:

An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, and a legislative determination that the primary objectives of an act and its amendments are essentially the same, although not binding on the court, will be given great weight. It has been held, however, that subsequent amendments cannot be considered as indicating the intention of the legislature in adopting the earlier statutes, and a subsequent amendment cannot be considered in construing the original statute *where the original statute was not ambiguous.*

82 C.J.S. *Statutes* § 384, at 899–900 (1953) (footnotes omitted) (emphasis supplied).

■ The fact that the Supreme Court hotly divided as it did in *Bifulco* makes it impossible to argue that the original § 846, considered in juxtaposition to § 841's minimum sentences, was not, at the very least, *"ambiguous."* Intelligent justices differed dramatically in their reading of it. This is proof-positive of § 846's *ambiguity.* Therefore, the recent amendment neatly falls into the unusual, but judicially recognized, category of an amendment that was not intended to *change* the law but only to *interpret* it and to make it easier for a bench consisting of technical grammarians, semantic purists, and sometime illiterates (as this judge was found to be in *United States v. White*), to comprehend. Congress may be tweaking the judicial nose when, after *Bifulco*, it flatly says of its *original* § 846 language: *"This would seem to indicate that any punishment imposable for a substantive drug violation would be imposable for an attempt or conspiracy to commit the same offense."* 134 Cong. Rec. S7448 (daily ed. June 8, 1988) (emphasis supplied).

Although Congress acknowledges *Bifulco* in its recent pronouncements on legislative history preceding the recent technical amendment, it has never publicly acknowledged that *Bifulco* was correct, and, in any event, as previously noted, *Bifulco* did not deal with the question of a minimum term of *imprisonment,* so that the competing principle of statutory construction which presumes that an amendment assumes and reacts to prior judicial interpretation, does not apply here, except, perhaps, as to that aspect of § 841 requiring a mandatory period of supervised release following incarceration. A non-incarceration penalty possibility was the only issue in *Bifulco.*

In other words, Congress has respectfully disagreed with the Supreme Court majority respecting the Congressional intent in 1970. Whom am I to believe?

*Fourth Factor:*

Since *Bifulco* was decided in 1980, all three of its dissenters remain on the Court, one of whom is now the Chief Justice. Three of the *Bifulco* majority have been replaced by Justices O'Connor, Scalia and Kennedy. It is difficult for me to conceive that the present Supreme Court, in light of subsequent, repeated expressions by Congress in its formal legislative history, would take *Bifulco* the illogical, giant step which would be required to find an original 1970 Congressional intent to give the *seller* of *five* kilograms of cocaine no less than ten (10) years in prison, while allowing an eminently successful drug lord to *conspire* to distribute *five hundred* kilograms of cocaine and receive no prison time whatsoever because he happens to cooperate with the investigators and the prosecutors.

The *stare decisis* of the limited holding of *Bifulco* has been eroded by subsequent legislative history, but the broad implications of *Bifulco*, here pressed by defendants, simply no longer exist in a form that would make expansion of *Bifulco* by the Supreme Court something that could realistically be anticipated.

### The End Result as to the Minimum Period of Imprisonment

■ If I were not bound by my oath to follow the Congressional mandate, I would be happy to honor the government recommendation erroneously requesting that I incarcerate Hayes no longer than four (4) years. Because under our system of government Congress makes the laws, and because those laws cannot be waived or ignored or manipulated by me or by the

Attorney General for perceived salutary reasons, and because Congress has recently seen fit to *clarify* its original intent and to prove that Congress always meant to make the penalty for *conspiracy* to commit a particular drug offense the same as the penalty for *committing the offense*, I have, by separate orders, sentenced these four defendants to custodial terms of ten (10) years each.

As noted, Hayes' plea of guilty was received on the express condition that he retains his right to appeal from his sentence insofar as it exceeds the sentence recommended by the government. Rule 11(a)(2), F.R.Crim.P. The court gives him the benefit of Rule 11(a)(2).

### 18 U.S.C. § 3553(e)

■ I find it fascinating that as to defendant Hayes (with whom the government made a solemn bargain, and from whom the government obtained significant assistance during the investigation lending to this indictment, even to the extent of Hayes' wearing a body recorder at personal risk to himself) the government refused pursuant to 18 U.S.C. § 3553(e), to ask me to impose a sentence less than the minimum which I had said precluded me from honoring the parties' bargain. Perhaps the explanation for this refusal lies in the fact that § 3553(e) expressly depends upon the existence of Sentencing Guidelines that are now under constitutional attack, and that all members of this court have found to be unconstitutional. On the other hand, perhaps it is a graceful way to acknowledge the probability that I am correct and to avoid the embarrassment of reneging on the agreement with Hayes. In either event, I am not authorized to invoke § 3553(e) *sua sponte*, it being available, by its terms, only "upon motion of the Government." See *United States v. Musser*, 856 F.2d 1484 (11th Cir.1988).

I would like to hope that the same government which convinced the Eleventh Circuit in *White* to find and honor the "broad remedial purpose" of a criminal statute will do the same in this case, and will simply concede that it was inadvertent-

ly mistaken when it made its promises to Hayes and Singleton, and, if not such a concession, at least that it will not argue to the Eleventh Circuit that my position is hardened against it, as it did in *White*.

### The Mandatory Special Parole Term Provision

■ I have not imposed a special parole term or a period of supervised release on any of these defendants pursuant to § 846 for the following separate and several reasons:

1. *Bifulco* dealt specifically with the *non-incarceration* element of § 846, making *Bifulco's* precedential value or *stare decisis* binding on me as to the single issue it addressed.

2. The thrust of *Marks v. United States*, considered in conjunction with *Bifulco*, presents serious an *ex post facto* and "due process" problems if a special parole term were here ordered. These defendants may have stayed up at night reading *Bifulco* before starting their conspiracy. In fairness, they should have been able to rely on *Bifulco*, narrowly but not expansively construed.

3. In *United States v. Portillo*, 863 F.2d 25 (8th Cir.1988), the Eighth Circuit, very recently, was called upon to decide whether to impose a "special parole term" or a "term of supervised release" for a § 841 violation which occurred before the change in the statutory language. The Eighth Circuit reversed a sentence of "supervised release" using the new language and remanded for the imposition of the old "special parole term." This chronological problem can be avoided by imposing neither post-release penalty.

4. The evolution in the language of § 841, reflecting the change from the words "special parole term" to the words "term of supervised release," was the result of the Congressionally ordered disappearance of the Parole Commission and the substitution of Sentencing Guidelines. Inasmuch as I still hope for the continuation of the Parole Commission, or of some similar entity to supervise parolees, because I believe the Sentencing Commission and its

products are unconstitutional, I hesitate to mandate a period of "supervised release" when I am not sure what it would mean.

### Conclusion

If the government wishes to cross-appeal to seek to require me to impose a minimum period of supervised release or a special parole term because Congress in 1988 was simply clarifying its original intent, it can, of course, do so. It will be interesting to know finally the government's position both on the minimum sentence question and on the post release supervision issue.

As noted, separate sentencing orders have already been entered consistent with this opinion.